## WILLIAM EDWARD YOUNG *v.* STATE OF MARYLAND

[No. 147, September Term, 1967.]

Decided June 7, 1968.

The cause was argued before MURPHY, C. J., and ANDER-SON, MORTON, ORTH, and THOMPSON, JJ.

*Leonard S. Freedman* for appellant.

*Donald Needle, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Howard L. Cardin, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

William Edward Young, the appellant, complains of convictions of murder and assault with intent to commit rape in a trial before John N. Maguire sitting without a jury in the Circuit Court for Baltimore County. He was sentenced to life imprisonment. He claims that his formal statement should not have been admitted into evidence; that a verbal admission should not have been admitted into evidence; and that there was insufficient evidence to support the convictions.

The evidence showed that Elizabeth Roddy, the deceased victim, a 72 year old female, resided in a first floor apartment at 877 Park Avenue, Baltimore, Maryland. She was last seen alive by Mary Wallace, 865 Park Avenue, Baltimore, Maryland, at approximately 3:45 P.M. on Friday, October 14, 1966, at the front door of 877 Park Avenue. On Saturday, October 15, 1966, about 6:00 A.M. the body was discovered by George Berse, a janitor and maintenance man at 877 Park Avenue, on the hallway floor of her apartment.

Elizabeth Roddy's body was found lying in a pool of blood. Her slip and housecoat had been pulled up around the upper

portion of her body while her panties had been partially ripped. An examination of her apartment revealed that the front door had not been physically forced open, and that a portion of several rooms had been ransacked.

The medical examiner's report, which was admitted into evidence by stipulation of counsel, stated that Elizabeth Roddy was a homicide victim. The report showed that she had been beaten about the head by multiple blunt force impacts causing severe skull fractures, cerebral contusions and hemorrhages. There was a superficial laceration and contusion to the entrance of her vagina; however, no spermatozoa was found. The injuries occurred, according to the report, between 3:00 P.M. on October 14 and 6:10 A.M. on October 15. From the condition of her clothing, injury to her vagina and the "toxicological findings," the report concluded that a sexual attack had at least been attempted. When the court called the medical examiner as a witness, he explained that a chemical examination of the washings from the vagina were positive—indicating a high degree of probability that "seminal fluid had been there but not necessarily a complete ejaculation."

David Rochester, 869 Park Avenue, testified that on October 14, 1966 at about 11:00 P.M. Young rang his front door bell and asked for a man named "John." William Schnieder, 871 Park Avenue, testified that on October 14, at about 11:00 P.M. someone rang his front door bell but that he could not identify the person since he did not go to the door. Russell Panzarella, 865 Park Avenue, testified that an unidentified white man rang the bell at his apartment house at about 11:00 P.M. October 14, 1966 and asked for "Frank," and that he admitted him saying that Frank Buchwitz lived on the third floor. Mary Wallace, 865 Park Avenue, testified that on October 14, at about 10:45 P.M. she saw Young walking down the steps from the second floor to the first floor of her apartment building, and that he left via the front door; and that on October 20, 1966, at about 3:45 P.M. she saw Young for the second time when he rang her front door bell and asked for someone named "Frank." Pauline Prendergast, 867 Park Avenue, testified that on October 20, 1966, at 3:30 P.M. to 4:30 P.M. she saw Young at the front door to her apartment building, and her aunt called

the police. When the police arrived at Read Street and Park Avenue, a half block from Pauline Prendergast's residence, they saw Young standing on the northwest corner; they asked him his name and what he was doing at that place. Young stated his name and that he was looking for "Frank, a man who sells clothes." The police thereupon took him into custody and drove him to the Central District Police Station arriving about 4:45 P.M.

At the police station he was interrogated promptly by Lt. Cadden. Some of the testimony as to the questioning is as follows:

> "A Well, I told him that we were investigating the case of homicide, and so forth, a woman that was found slain in her home. She had been sexually molested. He had a right not to discuss the situation. He had a right to remain silent. If he desired, he could get a lawyer of his own choosing. If he couldn't afford a lawyer, we were obliged to obtain a lawyer for him. He was advised that anything he said to us would be used against him in a Court of law. We wanted to call his parents. He pleaded with us not to. He stated his mother was ill with a heart condition and he had a great fear of his dad.
>
> "Q Where did you have this discussion about calling his parents?
>
> "A As soon as he was brought in.
>
> "Q Before any of this interrogation began?
>
> "A Yes.
>
> "Q What was his response to that?
>
> "A Please don't bother them. He constantly pleaded with us repeatedly. 'My mother is quite ill. She had a heart seizure. It is my bankbook.' He pays his own board. They did nothing. He had a great fear of his dad. He never explained that.
>
> "Q When you told him he didn't have to say anything, what did he tell you about that?
>
> "A He said he had nothing to say about it. He didn't need a lawyer. He had money and he didn't do anything.

"Q What, if anything, did you say to him when he said that?

"A He said he didn't need a lawyer. He said 'I don't need a lawyer.' verbatim.

"Q When you said he could have a lawyer, what type of response did you get?

"A We told him if he couldn't afford an attorney, we were obliged to get an attorney. We showed him this piece of paper that we carry. We read it there. Voluntariness of confession. Miranda versus State of Arizona. We are obliged to get him an attorney before proceeding.

"Q You said you had this form?

"A Yes, it is put into all folders without statement, after admonishing.

"Q You gave that to him to read for himself?

"A Yes.

MR. CARDIN: The State will offer this form that the officer uses as Exhibit No. 3."

Exhibit No. 3 reads as follows:

"June 21, 1966

## VOLUNTARINESS OF CONFESSIONS IN VIEW OF SUPREME COURT DECISION IN MIRANDA v. ARIZONA

"In addition to the traditional tests of voluntariness, i.e., that statements of the defendant may not be the product of threats, coercion, duress, promise of reward or of any other improper inducements, Miranda requires that prior to any interrogation, persons 'in-custody' must be advised of the following: (1) 'that he has the right to remain silent'; (2) 'that anything he says can be used against him in a court of law'; (3) 'that he has the right to the presence of an attorney,' and (4) 'that if he cannot afford an attorney, one will be appointed for him prior to any questioning, if he so desires.' "

At that time Young refused to make any statement so he was fed and placed in a cell until 8:00 P.M. when he was placed in a

lineup. After he was identified by several of the witnesses at the lineup he began to cry and made a remark which caused the officers to call Lt. Cadden.

"Q You said you admonished him again?

"A Yes, as to his rights again, very thoroughly.

"Q You are using the word again because of the prior interrogation?

"A Yes, I advised him, and told him he could remain silent. He didn't need to say anything further. He had a right to an attorney and we would get an attorney if he had no means to obtain an attorney. He was told that whatever he said there was going to be used in Court and anything further that he said would be used against him in Court.

"Q What did he say to this?

"A He was crying, very vigorously, 'I swear to God I didn't mean to kill her. And, I didn't rape her.' Wherein, he said molest, he didn't say rape. He said molest. And the medical examiner told us about this. Wherein he said he didn't rape her and he didn't mean to kill her and he was upset about it. We asked him if he desired to tell the story, if he desired to give a statement, and he said he did. He would tell the story.

"Q Do you recall what you said at that time?

"A I, again I told him, did he want to give a statement and he said yes. At that time, we prepared a paper to put in the typewriter. We started in on our routine questions, name, age, extent of education, his address, whether he could read or write, he began to relate the crime and I again admonished him as to his rights again. That is in the statement. He told us that he wouldn't sign the thing. I remember that.

"Q Let me ask you this. How many times in total did you admonish this man?

"A Three or four times, sir.

"Q And the first time was when?

"A When he was brought in by my men about 4:45 that afternoon. Then I told him as I was interviewing him regarding his presence in that area. I asked him

how many times—this was 4:45—and he told me several times the prior week, which was the week of the 16th. From the 9th to the 16th, and we got to Friday night, when he told us he was in that area about the time, about ten or 11:00 o'clock, the prior Friday night, the 14th, and I admonished him then.

"Q This was the first time?

"A That's right.

"Q When was the second time you admonished him?

"A When he came out of the line-up room. And he related to me what he stated, as he was conveyed from the line-up room, I admonished him again. Then again in the statement, three times, actually.

"Q You admonished him three times?

"A Yes."

\* \* \*

"Q (Mr. Cardin) Lieutenant Cadden, specifically, what, if anything, did Mr. Young say to you with regard to an attorney?

"A He told me that he didn't want an attorney at first. At first, he didn't do anything. After the line-up, when he made certain statements, I again admonished him that he may request a lawyer—I was quite emphatic. I must be emphatic in a matter such as this is, sir.

"Q When you say you were emphatic, go a little further.

"A Well, he could call an attorney if he so desired. He could call his parents. He cried 'Oh, my God, no, no, no, don't call. My mother is sick. Oh, God' and he went on sobbing and we told him we were obliged to get an attorney for him if he so desired.

"Q What did he say to that?

"A He didn't want an attorney. He never accepted this, or the response.

"Q What, if anything, did he say to you when you told him that whatever he said would be used against him in Court?

"A He said he understood this. I read him from the original sheet after I submitted it to him. We have to do this. We explain to these people regardless."

* * *

"Q When he was first arrested and you knew he was arrested and you were going to interrogate him about this homicide and rape and burglary, is there any reason why you yourself didn't telephone them and tell him where he was held?

"A He stressed the fact that he was independent, that he had his own bankbook, he showed us that, with a considerable amount of money, $5,000, and he said he was independent, all he did was sleep home. That he didn't want anybody. At first he was pretty arrogant. At first he didn't need anybody, he didn't want to call his parents."

Officer John Lewandowski testified as follows:

"Q (Mr. Freedman) Now, when the interrogation began at approximately 4:45 or five p.m. on the 20th of October, you were present at the beginning, weren't you?

"A Yes, I was.

"Q Who did the talking to start with?

"A Lieutenant Cadden.

"Q What did he say to the Defendant?

"A He advised him of his constitutional rights.

"Q I didn't ask you what he did. What did you do?

"A The words what he said?

"Q To the best of your recollection, yes.

"A He advised him that he did not have to say anything. That anything that he said would be held against him. That he could have an attorney present during this interview and that he could conclude this interview at any time.

"Q What did the Defendant say about all that?

"A Well, the lieutenant asked if he understood what he said and the Defendant said, yes, he did."

Detective William Craig testified to the following:

"Q And at any time during that interrogation, did Lieutenant Cadden admonish the Defendant with regards to his constitutional rights?

"A Three or maybe four times he advised him of his rights.

"Q You are talking particularly about the interrogation that began at 4:45 p.m.?

"A At least once, maybe twice during the first interrogation, yes.

"Q Would you briefly describe what constitutional rights Lieutenant Cadden advised Mr. Young of?

"A He advised Mr. Young that he had a right to remain silent, not to answer any questions. He had a right to have a lawyer at his side. If he could not afford a lawyer, that the Police Department would make arrangements to supply him with one.

"Q I show you State's Exhibit No. 3A, and ask if you can identify that?

"A Yes, this was shown to the Defendant here, given to him to read.

"Q During this 4:45 interrogation?

"A Yes, sir.

"Q Who gave it to Mr. Young to read?

"A Lieutenant Cadden.

"Q Did you see him do that?

"A Yes, I did."

\* \* \*

"Q What happened then?

"A Then I took him into the interrogation room and Lieutenant Cadden was called. I advised him of what the boy had said, of what he said.

"Q What, if anything, was Mr. Young doing?

"A He was shaking and trembling, crying and completely upset.

"Q What was the next thing that happened?

"A He was then again advised by Lieutenant Cadden of his rights.

"Q What rights?

"A The same thing. He had a right to remain silent, not to talk about anything at all without a lawyer, and he could be supplied with a lawyer.

"Q Then, what happened?

"A Then Lieutenant Cadden also asked him, asked on a couple of occasions if he would like to call his parents.

"Q Who said that?

"A Lieutenant Cadden.

"Q Asked this of Mr. Young?

"A Yes, sir.

"Q You say that he did that on several occasions?

"A He did during the first and second interrogation.

"Q Are you personally aware of whether or not the Defendant was fed at any time on October 20, 1966?

"A Yes, he was once. I was sitting there while he was fed a meal that was brought into him."

In addition the evidence also showed that Young had a tenth grade education, was self-supporting and had a bankbook showing an account in his name in the amount of $5,000.00, which he had saved. He was, at the time of his arrest, employed at one full time job and one part time job. Although prior to obtaining his then current employment his employment record had been sporadic. He had been discharged honorably from the Navy after less than one month's service due to inability to adapt to naval life. He was of dull normal intelligence, according to his privately retained psychologist, but Lt. Cadden stated that he appeared to be "reasonably sensible." The trial judge, in ruling on the admissibility of the statement after Young had testified on the issue of voluntariness, stated that he disagreed with the psychologist and that Young appeared to be a "very observing young man". The psychologist also stated that he had a personality disturbance which may be indicative of an incipient psychotic process.

Young was initially questioned beginning immediately after his arrest (about 4:45 p.m.) for a period lasting not in excess of

one hour. He was questioned again after the line-up (held at 8:00 p.m.) was concluded. The subsequent questioning took approximately 20 minutes, after which the written statement was taken and typed—from 8:58 p.m. to 11:00 p.m.

After the written statement was typed Young refused to sign it until he talked with his father. His father appeared at the police station in response to a telephone call and conferred with his son. Afterwards, Young again refused to sign the statement.

In the statement Young said:

> ". . .she started yelling at me and I started walking towards the doorway, I opened the door and she was following close behind me and she started yelling at me hurry up get out, then I got mad and I slammed the door towards her and the door hit her and she fell back against the wall and then fell down in the hall, I don't know if she was unconscious or what she just laid there, then I started looking around her apartment for Frank,[1] I didn't see anyone in the apartment, then I went back in the kitchen and got a drink of water then I left out the front door."

In testifying on the question of voluntariness of the statement Young denied that he was given any constitutional warnings; denied that he was fed; and claimed that the police officers refused his request to telephone his father to get a lawyer. At one point in his testimony he stated that he made the request to a Lt. Rollins who was not in the courtroom. Later he said he wasn't sure as to whom he made the request, but it was the officer who interrogated him. Police testimony showed that all of the interrogation was conducted by Lt. Cadden, whose testimony was in complete conflict with Young's testimony on these points. Young's statement contained a recital that the police officers made no threats or promises. In his testimony, Young does not claim that any promises or threats were made.

---

1. It appears that "Frank" was a chance acquaintance who lived near the scene of the crime and with whom Young had had some sort of unnatural sex experience.

## I

### The Admissibilty of the Written Statement

Young, on appeal, does not contend that the written statement was inadmissible because of a failure to comply with the detailed requirements of *Miranda v. Arizona,* 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, probably because the evidence set out above clearly shows that those requirements were fully met. *Brown v. State,* 3 Md. App. 313, 239 A. 2d 761. Neither is there a contention that the statement was not admissible because the totality of the circumstances showed that his will was overcome at the time the statement was made, probably because the evidence was to the contrary. *Brown v. State, supra.* The contention seems to be based on the frivolous ground that the statement should not have been admitted because of a "variance" between the indictment and the written statement. He seems to rely on *McGlothlin v. State,* 173 Md. 132, 194 A. 830 which clearly holds to the contrary. See 173 Md. at 135-36:

> "It is claimed that there is a variance in the indictment and the voluntary statement made by the appellant. The admissibility of the statement may not be denied because it does not refer to or tend to prove every element of the crime, provided it is identified by its own verbiage or by other evidence as relating to the crime charged in the indictment."

We hold that the written statement was properly admitted.

## II

### The Admissibility of the Oral Statement

The evidence showed that immediately upon his arrest on October 20, 1966, Young was fully warned as to his constitutional rights, and further that he understood what those rights were and that he expressly waived them. At that time he declined to make any statement. The evidence also discloses that about 6:00 p.m. he was given something to eat and placed in a cell until 8:00 p.m. when he was subjected to a line-up. After he was identified at the line-up he apparently broke down and made incriminating statements which were not introduced into evidence. The officers hearing these statements called Lt. Cadden, who

repeated the *Miranda* warnings after he heard him state "I swear to God I didn't mean to kill her." This is the oral statement to which objection is now made. There was, no objection to this evidence below and therefore under Maryland Rule 1085 the matter is not properly before us, but to avoid possible collateral attack on this ground we will consider the contention.

We think the evidence was admissible on two grounds: First, Young had received full *Miranda* warnings less than three hours before the statement was made and second, the statement was a volunteered statement. The Supreme Court in *Miranda v. Arizona, supra,* 384 U. S. at 478, 86 S. Ct. at 1630, stated:

> "In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."

The fact that Young was agitated at the time he made the oral statement does not make it inadmissible, see *McCleary v. State,* 122 Md. 394, 89 A. 1100, *Bryant v. State,* 229 Md. 531, 185 A. 2d 190, *Mundell v. State,* 244 Md. 91, 223 A. 2d 184, *Cooper v. State,* 1 Md. App. 190, 228 A. 2d 840.

### III

### Sufficiency of the Evidence

We cannot say that the trial judge was clearly erroneous, Maryland Rule 1086, when he convicted Young of assault with

intent to rape nor when he convicted him of murder. The medical examiner's report and his testimony were sufficient proof of the *corpus delicti* of both crimes. *Md. Code,* Art. 27, § 410, *Stackhouse v. State,* 1 Md. App. 399, 230 A. 2d 358. Young's statement that he was present at the time when the crimes were committed was corroborated by other witnesses who identified him as being in the neighborhood, even though such corroboration is not required. *Whitmer v. State,* 1 Md. App. 127, 130, 227 A. 2d 761, 762.

In *Pettis v. State,* 2 Md. App. 651, 653, 236 A. 2d 429, we said:

> "Proof of guilt beyond all doubt has never been required, even in the most serious criminal cases. *Tasco v. State,* 223 Md. 503. In *Berry v. State,* 202 Md. 62, 67, the Court of Appeals stated:
>
> > 'The trier of facts in a criminal case is enjoined by law to give due force to the presumption of innocence, and then to proceed cautiously in weighing the evidence; but he is not commanded to be naive and to believe without scrutiny every glib suggestion or farfetched fairy tale whether emanating from State or defense. An indispensable ingredient in judgment, in court as well as out of it, is a modicum of common sense.'
>
> "Likewise, in *Hayette v. State,* 199 Md. 140, the Court stated, at page 144:
>
> > 'To prove guilt beyond a reasonable doubt it is not necessary that every conceivable miraculous coincidence consistent with innocence be negatived.' "

*Judgments affirmed.*