# ROBERT CECIL WHITE *v.* STATE OF MARYLAND

[No. 526, September Term, 1970.]

*Decided August 13, 1971.*

2

The cause was argued before ANDERSON, ORTH and CARTER, JJ.

*Alvin Sellman* for appellant.

*James G. Klair, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Howard L. Cardin, State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

Elizabeth Ann White died on 7 February 1969 at the age of 14 years. The manner of her death was homicide. The cause of her death was "strangulation by ligature." Three loops of brown stocking were tightly wrapped around her neck—a single loop placed around her neck and tied with a "granny knot" at the back and the two ends wrapped in the same direction around the neck, overlaying the first loop and ending at the knot. A single loop of electrical cord was wrapped loosely around her neck.

The young girl was found in a bedroom of her home, completely nude, lying face down on a bed. Her arms were tied behind her back with the wrists held together by a brown stocking wrapped in a double loop around each wrist with a "granny knot" at the right wrist. There were five lacerations of the scalp produced by impacts with a blunt instrument which could have been a wrench found on the scene and on which there were blood stains and hair fragments. There were multiple superficial small abrasions of the back; their appearance was consistent with having been caused by a Phillips screwdriver also found at the scene. There were multiple superficial incised wounds of the neck and an abrasion of the left forearm. There were no lacerations or hemorrhages of the perineum, vagina, anus or rectum and no foreign hairs or other foreign material in that region. A strand of bloody mucoid material protruded from the external cervical os. There were "a few scattered spermatozoa, most with intact tails" found in an oral cavity smear but none identified on smears from the vagina and rectum.

Libby's 16 year old brother, Robert Cecil White, told the police he killed his sister. What he said was recounted by Detective Harold Rose of the Baltimore City Police Department.

> "He told us that he had intercourse with her about a year before. He said that on Friday, February 7th he saw Libby leave the house for school at 8:00 A.M. and he was leaving at 8:15 A.M. He said he saw Libby double back to the house, up the back alley, to go into the house. He then went to school and stayed until lunch bell rang, fifth period, at 12:10 P.M. Robert said that he then ran home and entered the house by climbing through the second floor rear window. He said Libby was on the first floor and he asked her to make love with him. She said no because she was sick. He began chasing her

around. He chased her upstairs to the second floor bedroom and threw her down on the bed. He picked up a wrench on the dresser and struck Libby on the head and then undressed her. Robert said that he then had intercourse with Libby, but not the regular way because she was sick. He had intercourse through Libby's rectum. When he got excited he pulled out and had a climax in the bath and had some on the bedsheet. He said while he was having intercourse Libby started to act up, so he hit her again on the head with the wrench. He said that he thinks he tied her hands behind her before he had intercourse but he wasn't sure. He said that after he finished he realized what he had done and he decided that he had to kill her. That's when he strangled her. He said that he picked up a knife and a screwdriver and was going to stab Libby, but couldn't bring himself to do it. So he either dropped the knife or threw it on the floor. He said that he had taken his clothes off when he started with Libby and when he finished he went into the bathroom and washed the blood off and then got dressed. He went downstairs and tried to look at television but kept seeing Libby's face. So he paced for a few minutes and decided he had to make it look as though someone else did it. He ran back to school and was one or two minutes late for the sixth period which began at 1:05 P.M. He stayed in school until classes were over at 2:40 P.M. and then walked home. On the way home he stopped at Grieble's Grocery Store on Pennington Avenue and bought a pepsi and four Tasty-Kakes. He ate three cakes and when he got home he went upstairs to the bedroom and placed the remaining Tasty-Kake and pepsi, some of which he drank, on the bed along side of Libby. He propped the pepsi against the pillow. He said

that he did this to make it look like someone else had been there. Then he ran from the house to his sister Wilma and told her that he found Libby. While his sister went to Robert's house, Robert went to a neighbor's house and called the police."

He was indicted, charged with murder and assault with intent to rape. He was tried in the Criminal Court of Baltimore. A jury found him guilty of murder in the first degree and the aggravated assault, adding the words "without capital punishment" to each verdict. Code, Art. 27, §§ 12 and 413. He was sentenced to confinement for the period of his natural life on the murder conviction and to 18 months concurrent therewith on the assault conviction.

It is firmly established in this State that when the prosecution seeks to place a confession before the jury and its admission is properly challenged by the defense, the court has the preliminary decision whether or not the confession was voluntary and should be admitted. To do so it hears evidence without the jury. It need not find on this evidence that the confession was voluntary beyond a reasonable doubt; its only duty is to decide whether the *prima facie* proof was such as to establish that it was voluntarily made. Voluntariness in this frame of reference includes not only the traditional concept of the word—without force or coercion, inducement or promise—but, as to trials held after 13 June 1966, that the procedural safeguards directed by *Miranda v. State of Arizona,* 384 U. S. 436, were employed. If the court finds a confession to be admissible it is presented to the jury, and when made within the required constitutional framework, this preliminary decision will not be disturbed on appeal unless there was a clear abuse of discretion. When the confession is presented to the jury, they have the final determination whether or not it was voluntary and whether or not it should be believed. To consider it they must find it to be voluntary beyond a

reasonable doubt. Thus evidence relevant to its voluntariness must be adduced before the jury and they are entitled to hear all of the evidence which affects its voluntary character and which the court passed on in admitting it. On appeal their ultimate determination of its voluntariness is reviewed by applying the tests as to the sufficiency of the evidence. Of course, if voluntary, whether or not it is to be believed goes to the weight of the evidence and the credibility of the witnesses, matters for the jury.[1]

It appeared that appellant made five inculpatory oral statements to the police in the presence of various persons. All were substantially the same. Appellant challenged the admission of these statements by a motion to suppress filed prior to trial. Upon a pretrial evidentiary hearing the court determined that three of them were admissible. At the trial of the general issue, after evidence tending to establish the *corpus delicti* of the offenses, evidence was adduced regarding the voluntariness of the three statements the court had ruled to be admissible. At its close the court overruled objection to the admission of the statements and the substance of them was given to the jury. Appellant claims that the court erred in denying his motion to suppress and in overruling his objection at trial to the admission of the statements.[2] It is patent in this case that if the preliminary finding of voluntariness was proper the overruling of the objection when the statements were offered at trial was proper for the evidence adduced at the hearing was substantially

1. The procedure regarding the admissibility of a confession was discussed in *Barnhart v. State,* 5 Md. App. 222. For a review of the standards of voluntariness see *Dennis v. Warden,* 6 Md. App. 295.

2. Despite the preliminary ruling by the court it was necessary that appellant make timely objection at trial to the admission of the statements to preserve the point for review on appeal. *McCarson v. State,* 8 Md. App. 20; *Edwards v. State,* 7 Md. App. 108. We consider that objection sufficient to preserve the point was here made although defense counsel permitted Rose to testify that "Robert told us he killed Libby" before he objected to the admission of the statements. At that point the State had shown compliance with *Miranda* as to the first statement but had offered no evidence with respect to traditional voluntariness.

the same as that adduced at trial. Appellant does not present a question going to the ultimate determination of voluntariness by the jury, which would be tested, as has been pointed out, by the rule regarding sufficiency of the evidence. His contention is limited to the propriety of the admission of the statements and our task is to ascertain by our independent constitutional appraisal of the record whether the *prima facie* proof was such as to establish that they were voluntarily made. If it was the court did not clearly abuse its discretion in admitting them.

Evidence adduced at the hearing showed that Robert had submitted to a polygraph examination on 8 February 1969 and thereafter been released. Before he took the examination he executed an Explanation of Rights form containing the warnings required by *Miranda v. Arizona,* 384 U. S. 436 and acknowledged that he understood them. On 11 February the police obtained information concerning his attendance at school on the day of the murder. Waiting until after Libby's funeral, they found him on the street about 3:15 p.m. and he agreed to accompany them for questioning. They drove to his sister's house where the family had gathered following the funeral and told his mother, sister and brother what they were doing. They arrived at the Homicide Office in Police Headquarters about 3:30 p.m. Thereafter in a period of about five hours he made four oral confessions, each the same in substance. Three police officers, Sergeant Harry R. Bannon and Detectives Harold Rose and William Craig were present when each statement was made. Assistant State's Attorneys Fred Grant and Stephen Harris were present when the second, third and fourth were made. Cecil White, Robert's older brother, was present when the fourth was made. All testified. Evidence offered by the State was that there was compliance with the procedural requirements of *Miranda* before each of the first three confessions was obtained. This was done by reading to Robert the Explanation of Rights form, a copy of which was also given him to read. This form set

out not only the rights required by *Miranda* [3] but contained as paragraphs six and seven the following:

> "6. That I have read this explanation of my rights and I understand the explanation. I hereby declare, with full knowledge and understanding of my rights, that I do not want a lawyer at this time. I am willing to answer questions and I wish to make a statement.
>
> 7. That no promises or inducements have been offered to me by anyone. I have not been threatened or intimidated by anyone and I have not been forced to make a statement. The decision to make a statement is entirely free and voluntary on my part."

With respect to the first confession Robert stated affirmatively that he understood his rights as read and explained by Rose and about 4:15 p.m. he made a statement. Immediately thereafter he denied the substance of it. Questioning stopped and the police called the State's Attorneys Office for advice. While awaiting the arrival of an assistant state's attorney Robert was given a meal —meat loaf, mashed potatoes, bread and coffee. Grant and Harris arrived about 7:00 p.m. Rose again read the rights to Robert and then Grant explained each right to Robert who acknowledged that he understood them.

---

3. The form read:

> "1. That I have an absolute right to remain silent.
>
> 2. That anything I say or write may be used against me in a court of law.
>
> 3. That I have the right to consult a lawyer before any questioning and to the presence of a lawyer before answering any questions or at any time while being questioned.
>
> 4. That if I want a lawyer and cannot afford to hire one, I shall not be asked any questions and the Court will be requested to appoint a lawyer for me.
>
> 5. That if I agree to make a statement, I may stop at any time and request the presence of a lawyer and that no further questions will be asked of me."

Nos. 1 through 4 comprise the required warnings. No. 5 seems to emphasize rights included in the first four warnings. See *Miller v. State*, 251 Md. 362, 377-378; *Robinson v. State*, 1 Md. App. 522, 526.

Robert repeated the statement he had previously given and again repudiated it immediately thereafter. When the police talked to Grant on the telephone he suggested that the parents be asked to come in. A car was dispatched for them. Robert's father and brother arrived about 8:30 p.m. The father was taken into Robert's presence and the rights were read to them. Each said he understood them. Robert made a statement which was in substance the same as those previously made. And when the father left the room again denied that he had done what he confessed he did. Grant told the father that Robert repudiated the confession and asked the father to go back in the room to hear the denial himself. The father requested that James, the brother, also be present. James told Robert "just tell the truth. We are with you if you did this." The father said, "Be a man, son. If you did this, then we will help. And we will get help for you, and we will stick with you." He asked Robert if he did it and Robert said he did. He gave the statement a fourth time. The father said, "Bobby, you are being a man telling the truth." Robert looked at his father and said, "I didn't do it." Questioned by his father he said he was protecting his brother-in-law who had been messing around with Libby. The brother joined in the questioning and then said, "Bobby, just tell us the truth." Robert started to cry and said, "I did it; I did it; what I said was the truth." He told the story again; it was basically the same as he had given before. The next day Robert was given a second polygraph examination and made a fifth statement.

Robert did not claim that he had been physically abused. He did say that the police had threatened to make him masturbate to compare sex cells unless he confessed and that they told him that they could help him out at Perkins and would help him get an education so he could get in the Air Force. The masturbation allegation was specifically denied by each of the State's witnesses and there was testimony from them that no one had used any force or coercion, inducement or promise to obtain

the confessions. Robert said he had nothing to eat on 11 February from 8:00 or 9:00 a.m. when he had breakfast until the meal at the police headquarters about 6:15 p.m. His nerves were on edge—"I was shook up from the funeral and everything." At first he did not know whether the rights had been read to him. Later he admitted that they had but asserted he did not understand them. He did not want his father present because his father had threatened to kill the person who murdered his sister. The father denied that the rights were read or explained in his presence. It was not disputed that Robert was 16 years of age when the crime was committed, that he was in the ninth grade, and that evaluation by the Clifton T. Perkins Hospital staff disclosed that he "achieved a full scale I.Q. of 82 on the Wexler Adult Intelligence Scale, which places him within the borderline defective range of intellectual functioning. In the opinion of the psychologists, however, Mr. White has the potential function at the dull normal level of intelligence."

The lower court held that the first three statements were admissible in evidence as voluntarily made in the traditional sense and within the context of *Miranda.* On appeal appellant presents eight questions in claiming the lower court erred in its ruling.

As to question 1, we agree that each of the statements were obtained by a custodial interrogation within the meaning of *Miranda* and thus each was within the ambit of the *Miranda* dictates. *Myers v. State,* 3 Md. App. 534; *Duckett v. State,* 3 Md. App. 563.

Questions 2 and 3 go to the absence of appellant's parents when the first and second statements were made. What is material is whether the evidence showed that the police held appellant incommunicado. The lower court found "no evidence to substantiate any claim that the defendant was incommunicado." It said:

"As a matter of fact the police, before taking the defendant to the station house for further

interrogation on February 11th, drove to the house where the defendant's family was situated and advised his mother and brother and sister that they were going to take him to the police station for further questioning. While the family objected to the police officer taking the defendant to the police station, such taking was not done without their knowledge, nor were the parents or the family of the defendant in any way prevented by the police from consulting with him or furnishing him with an attorney. Nor was the defendant prevented from consulting his family or having an attorney present during the course of the interrogation. As a matter of fact, and I find as a fact, that the defendant did not want his father present, nor his brother present, because he was afraid his father would hurt him, both the brother and father having threatened to kill the person who killed his sister. I find further that he, the defendant, at no time requested an attorney to be present."

These factual findings were based on credible evidence. Compare *State of California v. Stewart,* decided with *Miranda,* 384 U. S. 436, in which Stewart was isolated with his interrogators for five days and nine interrogation sessions. At 497. On our independent constitutional appraisal we find that the absence of appellant's parents when the first and second statements were given did not preclude their admission. See *State v. Hance,* 2 Md. App. 162.

Questions 4, 5 and 6 concern the rights prescribed by *Miranda.* The lower court found as a fact that appellant had been informed of the constitutional rights required by *Miranda* before each of the first, second and third statement was made. There was ample evidence to support this finding and we are in accord with it. The inquiry then is whether appellant was capable of knowingly

and intelligently waiving his rights. The lower court found that he said he understood his rights and in so finding it noted that he had signed an Explanation of Rights form on 8 February before the first polygraph examination. It also took into consideration appellant's age and education and had before it the evaluation of the Perkins' staff. There was also the testimony of Grant on the matter. On cross-examination Grant said that he felt that appellant understood his rights. Defense counsel asked why he so felt. Grant explained:

> "My observations of him while he listened to Detective Rose and responded that he understood, and my observations of him during my conversation with him when I again explained what I thought was clear, everything that Detective Rose had read and asked him, and after each one if he understood. My observations of him when he responded to me that he did, and his discussion about not wanting his father present because he was afraid to tell this in front of his family. I felt from all of this that I was satisfied that he understood what he was being told."

It was not merely that appellant said he understood. "There were other things that entered into it. I observed him while he was listening to the rights. I observed him while I was talking with him. And I was closer to him than I am here. I was approximately two feet from him. I observed him while I was talking with him, his response to me and also his discussion about not wanting his family there, not wanting his father there, indicated to me that he understood, that he was a person of good understanding and that he understood what was going on in that room." Harris testified that he was satisfied that appellant understood his rights. "Detective Rose read the [Explanation of Rights] sheet to him, or the words from the sheet, and then Fred Grant went back and explained

it in words, as I said before, a simplified form. He explained it to him and asked him if he had any questions, and he said no. From all the things, I can't say just from when Detective Rose read it to him, but from all these things together, I was satisfied from the treatment that I observed, which I observed of the young man at that time, plus when Fred Grant went and explained it to him and asked him if he had any questions, or if he understood. He said he understood it and had no questions." Understanding his rights, they were effectively waived by appellant immediately thereafter making a statement. See *Brown v. State*, 3 Md. App. 313; *Fowler v. State*, 6 Md. App. 651. Appellant was not incapable of understanding and waiving his rights because of his age, *Wiggins v. State*, 4 Md. App. 95, or because he was nervous and agitated, *Young v. State*, 4 Md. App. 286. Nor do we think that his educational background and evaluation by the Perkins' staff compel a conclusion that he was not capable of understanding. Making our independent constitutional appraisal we were impressed by the comprehension and acumen evident in appellant's testimony on both direct and cross-examination.

Appellant indicates that it would have been easier for the State to prove he waived his rights had the authorities obtained a signed waiver. He points out the various reasons advanced by the State's witnesses to explain why he did not sign a waiver form. However, it is not necessary for an effective waiver that it be in writing and signed. Whether he refused to sign it or whether the police did not request him to sign it because of his age or the absence of his parents or some other reason is not determinative here of the question of an effective waiver *vel non*. Grant explained why he did not attempt to have appellant sign a form:

> "The matter of submitting it is a police procedure. I didn't feel it was necessary. I felt that the necessary thing was that the defendant understood and voluntarily waived these things."

We agree. We conclude that appellant's rights were effectively explained to him, and that he was capable of and did waive them in making the first, second and third statements. See *Gill v. State,* 11 Md. App. 378.

In question 7 appellant asks why the statements were not reduced to writing. That they were oral did not affect their admissibility. *Bazzell v. State,* 6 Md. App. 194; *Cooper v. State,* 1 Md. App. 190. The reasons advanced as to why they were not reduced to writing as well as the substance of them went to the weight to be given them and whether they were to be believed, matters for the jury.

Question 8 asks whether the oral statements were "extracted from him through fear, trickery, cajoling, or undue influence." The lower court found that the three statements it admitted were a free and voluntary act on the part of appellant. The allegations of appellant were refuted by evidence adduced by the State and the lower court did not have to believe them. It found "that there were no threats, promises, inducements, duress or other pressure upon the defendant to cause him to give these statements against his will and consent." We agree with its conclusions on our independent constitutional appraisal. We find that the *prima facie* proof in law was such as to establish that the three statements were voluntarily made. We hold that the court did not err in denying the motion to suppress or in overruling the objection to their admission.[4]

Appellant also contends that the lower court erred in refusing to grant a mistrial. On the third day of the trial Cecil White, appellant's father, testified in appellant's be-

---

4. The court excluded the fourth statement, made in the presence of the brother because there was no evidence that appellant was again informed of his rights immediately before it was made. But see *Franklin v. State,* 6 Md. App. 572; *Brown v. State,* 6 Md. App. 564; *Young v. State,* 4 Md. App. 286; *Robinson v. State,* 3 Md. App. 666. It excluded the fifth statement taken at the polygraph examination on 12 February because at that time the Assistant State's Attorney had informed appellant's father that appellant would be charged and a lawyer should be obtained.

half. He was examined about the second lie detector test given his son on 12 February. On cross-examination he was asked if he learned the results of the test. Objection was sustained. Then defense counsel said: "I don't think anyone knows the results of it. Maybe Mr. Cardin's [the prosecuting attorney] got it." Cardin replied: "The State will be glad to provide the results of the test since Mr. Sellman [defense counsel] said he doesn't know. We wouldn't want to hide any evidence from the defense lawyer. You want it?" Defense counsel asked to approach the bench and requested a mistrial. The court recessed and retired with counsel to its chambers. Defense counsel admitted he made an improper remark but argued that a mistrial was required. The prosecutor pointed out that defense counsel did have a copy of the results of the test and was well aware of the findings. The court denied the motion, stating that it would admonish the jury. It instructed the jury:

> "Madam Forelady, ladies and gentlemen of the jury, immediately prior to the recess both counsel for the defendant and the State had an exchange regarding the results of the lie detector test. The results of a lie detector test. This exchange between them was improper and should not have been made before you. Counsel know that the results of such tests are inadmissible in evidence if objected to because the result is not regarded by the Court as being trustworthy for your consideration. Therefore, you will disregard any reference by counsel to the lie detector test results and give this exchange between them no weight in your consideration."

In the light of the prompt admonition to the jury we see no abuse of discretion in the denial of the motion for a mistrial. *Baldwin v. State,* 5 Md. App. 22, 28. See also *Gerstein v. State,* 10 Md. App. 322; *Chandler v. State,* 7 Md. App. 646; *Parker v. State,* 7 Md. App. 167.

*Judgments affirmed.*