Herbert Reed Beckham was indicted and convicted for the offense of robbery and sentenced by the trial court to serve twenty years in the state penitentiary. He prosecutes this appeal in forma pauperis. The only issue raised concerns the admissibility of appellant's purported confession.
Mr. Max Cornelius, the owner-manager of the Dixie Speed Check store on Vanderbilt Road in Birmingham, testified that, on Sunday, July 22, 1979, he and a cashier, Sandra Edwards, were working in the store, described by Mr. Cornelius as a "supermarket." He stated that appellant, whom he positively identified in open court, frequented the store "at least two or three times a week" (R. 16), and had come in on the morning of July 22, between 11:00 and 12:00 o'clock. Mr. Cornelius, who did not know appellant by name, saw appellant in the company of two other people, a white male and a white female. The witness stated that he first noticed the trio in the check-out line, and that while in line the male and female, short on money, "had asked the other individual, which is Mr. Beckham, for some money to make a purchase. Mr. Cornelius testified that he saw appellant again around 3:00 o'clock the same day and that he made a purchase of "a large drink" (R. 18-19).
Mr. Cornelius further testified that he next saw appellant around 7:00 o'clock on the evening of July 22, 1979, 7:00 o'clock being the store's closing time on Sundays. The witness stated that appellant "came into the store with a sawed-off, double barrel shotgun in his hand" (R. 20), and that appellant was clothed in blue jeans and a white undershirt. The appellant was holding a red handkerchief over his mouth and nose with his free hand, and stated, "`This is a holdup. I want your money.'" Mr. Cornelius stated that, though he initially thought that appellant was joking, he changed his mind when appellant pointed the shotgun at him and said, "`This is no joke. I want your money.'" The witness testified that appellant then demanded "`the bills'" and Ms. Edwards, the cashier, began filling a bank bag with money. After receiving the money, appellant ran out of the store, followed by Mr. Cornelius, who stated that he saw appellant meet "another boy, short and stocky built boy" some distance away. Both fled the scene, and Mr. Cornelius lost them in a residential area near the store. The witness stated that the sum of money taken in the robbery was $2300.00, and further testified that appellant had had "bushy, curly" hair when he had seen him on the day in question (R. 21-24).
On further questioning, Mr. Cornelius testified that he attended a line-up at the police station on July 24, 1979, with the cashier, Ms. Edwards, but was unable to identify any of the line-up participants. He stated that he returned several days later for a second line-up, and identified appellant at that time from the group.
Sandra Edwards testified that she was employed by Dixie Speed Check, and had been so employed on July 22, 1979, in the role of cashier. She identified appellant as an individual who had frequented the store several times a week during the period of a month, and that, on July 22, she had first seen him around 11:00 in the morning. She stated that she was working the cash register, and that appellant and another man and woman entered her line. The appellant was dressed in blue jeans and a "tee shirt." She further stated that the trio entered the store again around 3:00 or 4:00 o'clock that afternoon, and that at that time appellant's companions borrowed some money from appellant. The appellant purchased a drink and left. Ms. Edwards stated that, around 7:00 o'clock that evening, appellant again entered the store, this time armed with a *Page 575 
gun and covering his face with a handkerchief. The witness testified that she thought appellant was joking and thus began laughing, but that another customer stated, "`Well, he's not joking, so give him the money'" (R. 47); this the witness did, putting the money in a bank bag. Ms. Edwards stated that appellant then fled the store.
Ms. Edwards further stated that appellant had been armed with a sawed-off shotgun, and identified a State's exhibit as very similar to the type of gun held by appellant. She testified that appellant had dark hair, which was long and curly, and had, she thought, blue eyes. On cross-examination, the witness acknowledged that appellant's eyes are brown, but stated, "I didn't look at his eyes, I was too nervous to notice" (R. 56). The witness testified on re-direct examination that she attended the two lineups with Mr. Cornelius, and that she identified appellant at the second line-up.
J.B. McIntosh, a patrol officer with the Birmingham Police Department, testified that he was on duty on July 22, 1979, during the 11:00 p.m. to 7:00 a.m. shift. He stated that he received a call to proceed to the 3800 block of 39th Avenue, North, which he did, arriving around midnight. He testified that, upon his arrival, he saw several people, including appellant, standing in the yard. The officer testified that he placed appellant under arrest, and later had occasion to enter two apartments located at the address. He further stated that he found portions of a sawed-off shotgun hidden in each of two stereo speakers in an apartment inhabited by one Jimmy Crumptin, a white male, and one Sandra Stevens, a white female. The officer was unable to positively identify the shotgun found as the same one entered as State's evidence, although the evidence tag number matched the arrest report number. On cross-examination, the officer stated that, besides appellant, a female and another white male juvenile had also been arrested. This male juvenile, whose name was Chisholm, was described as having a fairly normal build, blonde hair, arranged "semi-afro" style, and blue eyes. The witness stated that he also knew Jimmy Crumptin, but was unable to describe him in detail.
H.L. Miller, a sergeant in the Birmingham Police Crimes Against Persons-Robbery Division, stated that he was assigned to the robbery of the Dixie Speed Check store, and had subsequently conducted two line-ups, at which Mr. Cornelius and Ms. Edwards were present. Sergeant Miller stated that appellant was not included in the first line-up, but was present in the second. He was identified by both Mr. Cornelius and Ms. Edwards. At this point a hearing was conducted outside the presence of the jury.
During the hearing Sergeant Miller testified that he had talked with appellant at the City Jail after the second line-up on July 27, 1979. He stated that he, a Sergeant Hurst and appellant were present. The officer further stated that he did not offer appellant any hope of reward of remuneration, that he did not promise appellant any lighter sentence or that things would go better or worse for him, that he did not threaten or coerce or intimidate appellant, and that he informed appellant of his Miranda rights by reading them "from a card" (R. 85). The witness stated further that he did not have a "Miranda
waiver form" because the "Jail was out at the time" (R. 85), but that he asked appellant if appellant understood his rights and wanted to talk to them. To this, Sergeant Miller testified, appellant "told us, yes" (R. 86). The officer further stated that, at that point, he gave appellant a copy of the arrest report, which appellant read, and told appellant that he had been identified by two persons at the line-up. The officer stated that appellant told him that the second person at the scene of the robbery was not the juvenile arrested with him, but was Jimmy Crumptin. He stated that appellant further said that the shotgun located in the stereo speakers was the one he had used in the robbery, and "he said he was the one that went in with the shotgun, and Jimmy Crumptin stayed outside" (R. 87). *Page 576 
On cross-examination, the officer stated that no tape recorder was used to record any of this conversation, and that he had not written any of the conversation down, but was relying on memory. He repeated his version of the conversation, and stated that Jimmy Crumptin had not been included in the line-ups.
Appellant was called, and testified that he had been in a line-up on July 27, 1979, and that he later talked with Sergeant Hurst, but not with Sergeant Miller. The appellant stated that Hurst had told him that he had "bad lucked" and "they picked you out," to which appellant replied, "Well, I just have to prove myself wrong — I'll have to prove myself innocent in a court" (R. 92). Appellant denied making any of the statements attributed to him by Sergeant Miller.
On cross-examination, appellant stated that he had talked with Hurst in the lineup room after he had been picked out, and that Hurst had not informed him of any Miranda rights. He further stated that Sergeant Miller had only questioned him concerning "a few robberies" on the day before the line-up. He further testified that he was also questioned about some robberies in Tarrant City by a Tarrant City officer, but that he never discussed the Dixie Speed Check robbery with Sergeant Miller. The court thereupon ruled that the statement made by appellant to Sergeant Miller had been made voluntarily and was thus admissible in evidence.
With the jury present, Sergeant Miller was questioned as to the matters covered in the voir dire, and testified to the same matters. The State thereupon rested, and appellant's motion to exclude was overruled.
The appellant took the stand, and testified that he had pled guilty to several counts of burglary and theft of property in Arkansas. He further stated that he was familiar with the Dixie Speed Check and frequently went there, but that on the evening of July 22, 1979, he had driven to Jacksonville, Alabama, to visit some relatives. He testified that, on the way to his sister's house in Jacksonville, he saw a girl friend, Carol Scoville, and waved to her, and that Ms. Scoville returned the wave. He stated that he arrived at the house at 7:15 p.m., and stayed approximately thirty minutes before leaving for a cousin's house. Upon finding that his cousin was not home, appellant then drove to Atlanta to visit Six Flags Over Georgia, stayed the night in a Holiday Inn in Atlanta. He denied committing the robbery of the Dixie Speed Check, and denied confessing to Sergeant Miller.
On cross-examination, appellant admitted knowing Jimmy Crumptin but denied having seen him on July 22, 1979, and denied giving him any money in the checkout line of the Dixie Speed Check that day. He further denied going into that store at any point on July 22, 1979, but stated that he was familiar with Sandra Edwards, the cashier. Appellant reiterated that he had left for Jacksonville at 6:00 o'clock, had seen Carol Scoville, and had visited two other homes as well before going to his sister's house. He further stated that he was certain he arrived at his sister's at 7:15 p.m. Appellant testified that, though Carol Scoville had been his girl friend at one time, they had stopped dating and had not gone out socially since March, 1979. He further stated that no one accompanied him to Atlanta. The appellant admitted that he had told none of this sequence of events to Sergeant Hurst, but did tell the arresting officer that he had just returned from Atlanta. The appellant denied putting the shotgun in the stereo speakers.
Carol Scoville, a resident of Jacksonville, Alabama, testified that, on July 22, 1979, she was out in front of her residence when the appellant drove by and waved. She stated that appellant later returned and told her that his sister was not at home.
On cross-examination, the witness stated that, in her best judgment, this had occurred around 7:00 o'clock. She further stated that appellant then returned to his sister's house, and that his sister arrived about then. The witness then testified that she had discussed the case with appellant's attorney and appellant's sister and grandfather, *Page 577 
but that she had not done so until about two weeks before trial. She denied that she and appellant had ever dated or that she had been appellant's girl friend. At this point, the defense rested.
 I
Appellant's sole contention concerns the overruling by the trial court of appellant's motion to exclude the State's evidence of appellant's alleged confession as elicited through the testimony of Sergeant Miller. Specifically, appellant argues that it was error to allow the officer to testify as to the conversation with appellant in that the conversation was not recorded through any means, and thus any testimony by Sergeant Miller was based upon sheer memory. To this end, appellant cites us to a number of authorities which indicate that correct procedure would dictate that such conversations be recorded electronically, or at least stenographically. While, no doubt, such a procedure is advisable, we hold that Sergeant Miller's testimony concerning the conversation was properly admitted before the jury.
In Elkins v. State, 250 Ala. 672, 35 So.2d 693 (1948), our Supreme Court held that both the written statement and oral testimony of a witness who heard the contents of that statement spoken by defendant are admissible as primary evidence:
 "All that the accused voluntarily wrote or said which is material to the charge, is competent against him because it is his own admission and against his own interest. The witness testifies not as to what the writing contains, but as to what he heard the defendant say."
The Elkins holding was followed by this Court in Fleming v.State, 57 Ala. App. 556, 329 So.2d 616 (1976), where we held that the erasure of a tape recording of a defendant's confession did not preclude oral testimony by an officer as to what the defendant had said. We noted:
 "It is unfortunate that the recording on the tape was erased and not available for the defendant's consideration or use. The defendant testified as to what occurred. His version was not accepted as true. We do not think the unavailability of the recording due to the improvident erasure would preclude the admission of the oral testimony of the witness as to the defendant's inculpatory statement."
See, also: Parker v. State, Ala.Cr.App., 337 So.2d 1378 (1976);McBryar v. State, Ala. Cr.App., 368 So.2d 568, cert. denied, Ala., 368 So.2d 575 (1979). And it is clear, not only from the above-cited decisions of the courts of this State, but also from the decisions of courts of other states, that whether the incriminating statements were recorded in some fashion or not would go only to the weight to be afforded them, and not to their admissibility. See, People v. Duren, 9 Cal.3d 218,507 P.2d 1365, 107 Cal.Rptr. 157 (1973); Ashley v. State,265 So.2d 685 (Fla. 1972); People v. Multari Equipment Corporation,40 A.D.2d 836, 337 N.Y.S.2d 295 (1972); People v. Burbank,53 Ill.2d 261, 291 N.E.2d 161 (1972); White v. State,13 Md. App. 1, 280 A.2d 283 (1971). Thus, as stated in United States v.Pollard, 509 F.2d 601 (5th Cir. 1975):
 "We reject the invitation to sponsor this departure from time-tested principles of the law of evidence, evolved through centuries of Anglo-American jurisprudence. Such a rule would permit conviction of one defendant on the strength of an incriminating oral statement made to an ordinary citizen, while in the case of a fellow-defendant acquittal might be accomplished because of the exclusion of an oral statement made to an officer even after the execution of a written waiver of rights. The burden of the objection thus appears to be that law enforcement officers are less trustworthy, and more inclined to lie, than ordinary citizens. We perceive no basis for our so concluding."
There was no error in the trial court's allowing Sergeant Miller to testify as to what he heard appellant tell him despite not having same taken down and recorded in any fashion. Cases cited.
The appellant has not otherwise challenged the admissibility of his confession *Page 578 
except on the somewhat narrow grounds noted above. We find from the record that Sergeant Miller stated that he informed appellant of his constitutional rights, and that appellant waived those rights orally. Further, Sergeant Miller testified that he did not offer appellant hope or reward, nor did he coerce, intimidate, or threaten or abuse him. Appellant denied that any of this occurred. The question of voluntariness of an extra-judicial confession is one of law for the trial court, to "be determined by the trial judge in the exercise of enlightened discretion," and that court's decision will not be disturbed on appeal unless palpably against the great weight of the evidence. Bills v. State, 49 Ala. App. 726, 275 So.2d 706
(1973); Burks v. State, Ala.Cr.App., 353 So.2d 539 (1977). Whereas we find from the record that the trial court followed the correct procedure for deciding this question by conducting a hearing outside the presence of the jury, Reynolds v. State, Ala.Cr.App., 346 So.2d 979, cert. denied, Ala., 346 So.2d 986
(1977), we conclude on this record that there was sufficient evidence from which the trial court properly concluded that appellant's statements were voluntarily made. Cf. Hill v.State, Ala.Cr.App., 372 So.2d 405 (1979). After this determination of voluntariness, any issues as to the relative credibility of appellant and Sergeant Miller were properly left to the jury. Cases cited.
We have carefully examined the record in this cause, and find same to be free from error. The judgment is, therefore,
AFFIRMED.
All the Judges concur.