DeCARLO, Judge.
Brenda Sue Head was indicted by the Jefferson County Grand Jury for first degree murder of her husband, Roy Anthony Head. At arraignment, with retained counsel present, she pleaded not guilty. After a jury trial, she was found guilty of second degree murder. Later, she was sentenced to ten years imprisonment in the penitentiary-
The evidence at the trial showed that the deceased’s natural mother saw her son ap *861 proximately two days prior to his death. She testified that she later saw his body at the Davenport Smith Funeral Home. Further, she said that her son had been raised by his godmother, Mrs. Margaret Moore Head, from the time he was one year old.
During cross-examination, the witness stated that her son carried a gun in his car.
Margaret L. Head testified that her adopted son, the deceased, owned a 1976 Regal Buick and lived at 901 Goldwire Way, S. W., in Birmingham, with his wife, the appellant. According to the witness, her son had been married to the appellant, a student at Jefferson State College, for about one year.
On June 1,1978, at about 5:15 p. m., Mrs. Head had met her daughter-in-law, who insisted that the witness have dinner with the appellant and her mother. According to Mrs. Head, this was the first time she had been invited to dine away from home with the appellant; however, the witness had eaten with the appellant on Sundays on a number of occasions.
About an hour after they had returned home, Mrs. Head received a telephone call from the appellant. She sounded excited and told Mrs. Head that there was blood “and something white all over the utility room.” At that time, Mrs. Head asked the appellant if she saw the deceased or his automobile. The appellant responded that she did not. Mrs. Head instructed her daughter-in-law to stay there until she arrived and to call the detectives. Before Mrs. Head could leave her house, the appellant appeared and the two drove to the appellant’s house. After arriving, Mrs. Head saw “blood and brains all over the utility room.” At that point, Mrs. Head called the police. When the police arrived they talked to Mrs. Head and the appellant.
During cross-examination, Mrs. Head testified that her son was found on the Tuesday of the week after June 1, 1978.
Officer L. E. Strickland, an evidence technician for the Birmingham Police Department, responded to a call and went to the nineteen hundred block of 9th Avenue North on June 6, 1978. When he arrived, he saw a 1977 Buick Regal, bearing a ’78 tag numbered ABE-687, which was parked in a metered parking area. Although other officers were there, the car and the trunk were still locked. When the lock was pried off the trunk, a body, wrapped in a light colored blanket, was discovered. The body was in a deteriorated state, and photographs were made at that time. A .25 caliber automatic pistol and a Jefferson State ID card belonging to Windrell Floyd were found in the car.
Strickland testified that, on either June 6, 1978, or June 8, 1978, he had gone to 901 Goldwire Way and had made an examination of the utility room. He said that he found “minute reddish stains” on the back of the dryer and the washing machine, but the identity of the stains was never determined.
J. M. Glass, chief of medical investigation for Jefferson County Coroner Medical Examiners’ Office, testified that, on June 6, 1978, he had assisted in the performance of an autopsy on the deceased. According to Glass, the body was in a state of advanced decomposition and contained five gunshot wounds, four in the head and one in the chest. Three of the gunshot wounds to the head could have caused Roy Head’s death. Glass removed the projectiles from the body and turned them over to the Department of Forensic Sciences.
Lauden Yates, firearms identification expert with the Alabama Department of Forensic Sciences, testified that he received five spent projectiles which had been removed from the deceased’s body. These were identified as .22 caliber projectiles of unknown origin.
Detective Sergeant William T. Gaut of the Birmingham Police Department’s homicide division was in charge of investigating the death of Roy Anthony Head. Gaut was present when the body of the deceased was recovered from the automobile.
During the trial, an extensive voir dire examination was held out of the presence of the jury. The examination concerned a statement made by the appellant to Ser *862 geant Gaut. The testimony at that voir dire hearing indicated that Gaut’s investigation was focused on someone other than the appellant at the time she blurted out an incriminating statement. Sergeant Gaut’s testimony indicated that, after talking to her at her home and in his office approximately fifteen times, he had never considered her a suspect.
The issue during the voir dire hearing was whether a statement she made, which was later recorded and transcribed, was in fact voluntary. The defense attorney argued that the inducement held out to the appellant was, in essence, an offer of protection to her. She had stated to Sergeant Gaut and Sergeant Wallace that she was afraid. At the conclusion of the testimony on voir dire, the court ruled that, under the circumstances, a motion to suppress would not be granted.
After the voir dire examination, Sergeant Gaut testified that he had gone to the appellant’s home on June 6, 1978. At that time, he observed the utility room “and in an area between the washer and dryer there was substantial amount of bloodstains, both on the floor and on clothing laying there in the floor.” On the morning of June 13, 1978, Gaut and his partner, Sergeant Wallace, visited the appellant at her home. That same day, Gaut returned to the appellant’s home and had a conversation with her. Before the conversation, appellant was not a suspect and had not been advised of her constitutional rights. During the conversation, the appellant made a statement indicating that she and Windrell Floyd, whose “ID” had been found in the deceased’s automobile, were the guilty parties in the homicide. Gaut immediately stopped the conversation, advised the appellant of her constitutional rights and carried her to the police station. In the detectives’ room at the police station, he again advised her of her constitutional rights, then made a recording of her statement, which was later transcribed. In that statement, the appellant said that the deceased had threatened to kill her many times and that she had told her friend, Windrell Floyd, about the threats. She stated that she had also told her mother, her aunt, and a friend named Toni, about the threats. At the suggestion of her aunt, she had talked to an attorney, Drayton James, and had told him “everything.”
The appellant said in the statement, that, about three weeks prior to the homicide, she had discussed with Windrell Floyed, at Jefferson State, the idea of killing the deceased. They developed a plan which was to be carried out on a Thursday afternoon when her husband arrived home.
On the day the deceased was reported missing, Floyd went to the appellant’s home. The appellant allowed Floyd to enter the house. Her mother, who lived there, had no knowledge of Floyd’s visit. The appellant then left the house with her mother, leaving Floyd alone, and they went to the deceased’s mother’s home. Floyd waited in the house for the deceased to arrive home. Floyd intended to talk with Head about why he wanted to kill the appellant. According to the appellant, Floyd had to shoot the deceased because he had attacked Floyd. He told the appellant that he had shot the deceased in the head with a .22. She recalled that she had seen Floyd loading the gun in her house on the day of the shooting. Further, she said that Floyd had told her that he had placed the body in the trunk of the car.
In the statement, the appellant said that, when she returned home and saw the blood, she was not sure what had happened. She said she thought “it was Windrell’s blood at first.” However, the next day she talked with Windrell.
Gaut testified that he had taken the appellant home after the statement was made and did not arrest her until two days later.
At the end of Gaut’s testimony, the defense moved to exclude the State’s evidence on the grounds that the State had failed to prove a prima facie case.
The motion was overruled and the appellant, after calling a character witness, her next door neighbor, and the attorney, Dray-ton James, took the stand in her own behalf. The appellant denied that she took *863 any part in the killing of her husband. She testified that she had told Floyd about the threats the deceased had made on her life and that it was Floyd’s idea to come to her house on June 1, 1978. According to the appellant, she had told Floyd that the deceased carried a pistol. She also told Floyd that she wanted no part of anyone getting killed or hurt. Further, she said that the deceased had told her that he was going to kill Floyd.
During cross-examination, she admitted that, on Thursday, June 1,1978, the day her husband was killed, she let Floyd in the house. Further, she admitted that Floyd, at that time, showed her a pistol and she saw him load it.
I
The appellant contends that the trial court committed reversible error when it denied the portion of her motion to produce pertaining to the co-defendant’s, and accomplice’s, statement because the denial deprived her of information pertinent and material to the preparation of her defense.
Immediately prior to empanelling the jury, the defense counsel brought to the court’s attention the motion to produce which he had previously filed. At that time, the court inquired as to what the defense needed and what he had not obtained. The defense counsel stated that he desired a booklet taken from the deceased’s mother’s house and a statement which was made by the co-defendant. The court informed the appellant that a statement of the co-defendant would not be admissible. Counsel for the appellant listed other items which they desired, including a gun and a rope. The matter of the gun and rope was disposed of subsequently.
The appellant, under McLaren v. State, Ala.Cr.App., 353 So.2d 24, would not have been entitled to the statement:
“No absolute right to pre-trial discovery of a statement made by an accomplice to the police, implicating the defendant as the perpetrator of the crime charged, exists in Alabama ....
“In these cases unless the defendant shows an important reason to discover the contents of an accomplice's statement, such as to impeach the testimony of a witness or to uncover evidence tending to exonerate the defendant or aid in the preparation of his case, then generally the discovery is not allowed.”
In the present case, the appellant has failed to show any reason or need for the co-defendant’s statement. The co-defendant was not called as a witness, and the statement was not alluded to nor referred to during the trial. Beard v. State, Ala.Cr.App., 337 So.2d 1372.
II
The appellant insists the trial court committed reversible error when it allowed into evidence the appellant’s statement admitting her participation in the homicide. She argues that the statement was procured through promises given by the police and, thus, was involuntary.
Whether a confession is voluntary is determined by an examination of the totality of the circumstances surrounding the giving of the confession. Rogers v. State, Ala.Cr.App., 365 So.2d 322.
In the present case, an extensive voir dire examination concerning the admissibility of the appellant’s confession was conducted outside of the jury’s presence. Sergeant Gaut testified that, on June 1, 1978, he received a missing person’s report concerning the disappearance of the deceased. Five days later, he met the appellant in his office to inform her that her husband’s dead body had been discovered. During the next week, Gaut met the appellant approximately twelve to fifteen times and at no time during this period did he consider her a suspect.
On June 13, 1978, when Gaut went to the appellant’s residence and had the following conversation with her, he realized that she was involved in the homicide.
From the record:
“Q. On that occasion or at that point in time was Mrs. Brenda Sue Head a suspect in the death of Roy Anthony Head?
*864 “A. Not really, no, sir.
# # # # * $
“Q. What, if anything did you say to her on that occasion, and what if anything did she say to you?
“A. I went there to her home, and once inside I called Mrs. Head and her mother into the living room. And told her that I was fairly certain that we now knew who in fact had killed her husband, or we thought we knew.
“Q. All right. When you made that statement did you have a suspect in mind at that time?
“A. Yes, I did.
“Q. And who was that suspect?
“A. The suspect was Jack T. Israel.
“Q. O. K. Would you go ahead and tell us what else you said to Mrs. Head and what did she say to you at that time?
“A. I told her that we thought we knew the man who had killed her husband. And we also thought and felt like in talking to her that she had information that would be vital to the proving of the case. That we realized that she was scared, that she was scared to talk to us. And she apparently had indicated that in prior discussions or we had gotten that general idea. And we told her that it was now, you know, time for her to go ahead and just tell us exactly what she knew about the case and to not hold anything back. And tell us everything she could so we could prosecute the man that killed her husband.
“Q. All right. Let me ask you this: The suspect, Jack T. Israel, where did he live, if you know, Sergeant?
“A. He lived across the street from Mrs. Head.
“Q. All right. What if any response did Mrs. Head make to that statement?
“A. At that point she said 0. K., she knew that she would have to talk to me sooner or later. And that she had been wanting to talk to me for nearly "the entire week. And she asked her mother—
“THE COURT: Let me stop you here. Was this Israel fellow a legitimate suspect?
“THE WITNESS: Yes, sir.
“THE COURT: You really thought that he was the man?
“THE WITNESS: Yes, sir.
“A. She asked her mother to leave the room. And her mother got up and walked out. And she said, 0. K., I’m going to go ahead and tell you all about it. That me and Windrell, and she stopped there. And she said y’all know about Windrell? And I said, who is Windrell? And she said, Windrell Floyd, y’all have got his ID card. And she said it was me and Windrell. And I stopped her then and I said, wait a minute. We’re apparently not talking about the same thing.
“And at that point I stopped the conversation and told her that I thought we should go downtown and talk further.
“Q. All right. Out there at the house did you advise the defendant of her constitutional rights?
“A. I advised her of her constitutional rights at that point immediately prior to leaving, but not prior to the conversation.
“Q. All right.
“THE COURT: Excuse me. Who was Israel? Who is that?
“THE WITNESS: Jack T. Israel was a fellow, a young man in his 20’s that lived directly across the street from Mrs. Head. Investigation indicated that he was a known narcotics addict. On the particular day, back on June the 1st, we had gone through several police reports and found some several reports of violence at or about the the exact time that we thought that Mr. Head had disappeared. He had attacked his mother and father. The police had been called to him a number of times. The last thing that we had from his mother and father was that he was acting like a wild man. And at or about 4:30 or 5:00 on that afternoon he had run out of the house, and as I said, he was completely violent. He had at *865 tacked, like I said, his mother and father.
“In discussing Mr. Israel with his mother and father we found out that he had some contact with Roy Anthony Head, the defendant’s husband, across the street in a narcotics type situation. And from that standpoint we had come to the assumption that Jack Israel was a prime suspect and that possibility of the death might have occurred perhaps due to some narcotics dealings or something.
“THE COURT: What did you think she knew about it?
“THE WITNESS: We thought at the time that she might have known that Jack Israel or at least suspected that Jack Israel had killed her husband but was too scared to talk about it because Jack had a reputation in the neighborhood of being very violent. And we thought that she was literally terrified to tell us anything because of being afraid of Jack Israel.
“THE COURT: You may continue.
Q. At the time that statement was made to you, Sergeant Gaut, did anyone in your presence or knowledge or hearing threaten or abuse the defendant in order to induce her to make that statement about her and Windrell?
“A. No, sir.
“Q. 0. K. You took her on down to the station; is that correct?
“Q. That’s correct; yes, sir.
“Q. And when you got to the station—
“THE COURT: And you gave her her constitutional rights there at the house?
“THE WITNESS: I gave them both there at the house and again at the police headquarters.
“THE COURT: Would you go into that, please, sir?
“MR. NAIL: O. K., sir.
“Q. Well, we’ll take up the time at the house. How did you advise the defendant of her constitutional rights there at the house?
“A. I read from a card.
******
“A.And I asked her if she understood, and she replied she did.
“Q. All right. Did anyone at that time in your presence or knowledge or hearing make any promises or offer to reward in order to induce the defendant to make a statement at the house at that time?
“A. No, sir.
“Q. Did you or anyone in your presence, knowledge or hearing tell the defendant it would be better or worse for her if she made a statement?
“A. No, sir.
******
“A.we proceeded from there to City Hall to my office.
ft * * * * *
“Q. And did the defendant make a statement in response to your questions at that time?
“A. Yes, sir.
“Q. Now, prior to this statement being made did you again advise the defendant of her constitutional rights?
“A. Yes, I did.”
Further, the record shows that neither Sergeant Gaut nor anyone in his presence or knowledge threatened, abused, or offered any promise or hope of reward in order to induce the appellant to make the statement.
From the record:
“Q. In your opinion, did the defendant understand her constitutional rights?
“A. Yes, she did.”
During questioning by the defense attorney at the voir dire hearing the following occurred:
“Q. And if I understand, you went in and told her that you had a prime suspect or a suspect, someone that you thought had killed her husband; is that correct?
“A. In essence, yes, sir.
“Q. Did you tell her the name?
“A. No, sir.
“Q.. Now, I believe you’ve indicated that prior to that day that you had realized that she was scared? I believe that was your term; is that correct?
*866 “A. That’s correct, yes, sir.
“Q. On the prior occasions that you talked to her did she manifest being upset?
“A. Yes, sir.
“Q. On this occasion, June 13, did she appear to be upset?
“A. Yes, sir.
“Q. Nervous?
“A. Yes, sir.
“Q. She cried on occasions, didn’t she?
“A. On occasion, yes, sir.
“Q. And if I understand you, you told her that now was the time to tell you about what happened?
“A. Yes, sir.

“Q. At that time did you have any other suspect other than Israel?
“A. I would have to say, being an unsolved murder we hadn’t positively, you know, eliminated all suspects. I mean, there were a number of suspects, but Mr. Israel at that particular point was the suspect that our investigation had focused upon.
* * $ * * *
“Q. Was the tenor of the conversation that — with her that you knew that she was holding back and it would be best at this time to tell you about what happened; is that a fair description?
“A. I believe I told her, as I said, we knew that she was not telling us everything that she knew, or at least we thought she wasn’t.
“MR. WAITES: Excuse me just a second.
(Pause)
“THE COURT: Now do you mean that she wasn’t telling you everything — you thought she wasn’t telling you everything she knew about Israel?
“THE WITNESS: Yes, sir.
“THE COURT: Is that what you thought?
“THE WITNESS: Right. The purpose in not mentioning the name of Israel, I didn’t want to plant that particular name in her mind in the form that when she finally began to tell us about it we wanted her to be able to tell us all about Mr. Israel, rather than, you know, us telling her and simply having her verify or deny, you know, one thing or the other.
* # # * * *
“Q. Yes, sir. But did you not say any words that would indicate to her that she had no reason to fear?
“A. As I said, I don’t recall exactly. We indicated — Excuse me. I indicated to her that I knew that she was frightened, and I don’t recall whether I said anything about offering protection or not.
“Q. I understand that you didn’t say, ‘We will give you protective custody, or we will give you protection so that so and so won’t kill you.’ I understand that you didn’t make any specific remark like that. But was that not the gist of the conversation, that you felt like you knew who did it, and if she told you what she knew about it everything would be all right and she wouldn’t be hurt, in order to have her tell you what she knew?
“A. Yes, sir. I would say that that was the general gist of the conversation, yes, sir.”
From the foregoing testimony, it is not clear who or what was frightening the appellant. The gist of the testimony given was that she feared for her and her mother’s safety, but the source of the fear was unknown. Also, in the testimony we find that the appellant “felt like someone was trying to kill her husband, and she was afraid that she would be killed and her mother.”
During cross-examination of Sergeant Gaut at the voir dire hearing we find:
“Q. Now, on that afternoon if I understand you, I don’t believe you answered my question before and that is, when you told her in substance now is the time to tell you or talk to you, I’ll ask you if she then said y’all know about Windrell, me and Windrell, and then she stopped; is that what happened? Is that what you testified to earlier?
*867 “A. Well, no. She didn’t — Not in that text. She said, ‘Y’all know about Wind-rell.’
“Q. O. K.
“A. And I replied something to the effect of what do you mean, Windrell? And she said ‘Windrell Floyd. Y’all have got his ID card from the car.’
“Q. O. K. And that was—
“A. And I said, ‘Yeah, we know about Windrell.’ And she said, ‘Well, y’all know about it then. It was me and Windrell.’ And as I say, at that point it became obvious, and to my best recollection I said something to the effect of just a minute, I don’t think you and I are talking about the same thing.
“Q. And that’s when you advised her of her rights?
“A. That’s when I stopped and advised her of her rights, yes, sir.”
Prior to the court ruling on whether the statement was voluntary and constitutionally permissible, counsel for the appellant moved to suppress the statement on the basis that “she was induced to tell him what happened because he convinced her that she had no reason to fear, that something would be done about the situation.” At the end of the voir dire hearing, the court concluded that, under the totality of the circumstances, the statement was voluntary and the motion to suppress would not be granted.
The testimony during the voir dire hearing seemed to indicate that Gaut believed the appellant was afraid of Israel, the person suspected of the homicide at that time. Also, the testimony indicates that Gaut had no idea that the appellant was afraid because of being involved in the homicide. Gaut was taken by surprise when the appellant confessed, “It was me and Windrell.” At the time of the confession Gaut was speaking to the appellant as a witness, not as an accused. Kelley v. State, Ala.Cr.App., 366 So.2d 1145.
Gaut made no promises to induce the appellant to confess. No trick or deception was used in this case.
Before the admission was made by the appellant, the investigation had not focused on either her or Windrell Floyd. Under these circumstances, Gaut was not obligated to advise the appellant of her constitutional rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. See also C. Gamble, McElroy’s Alabama Evidence, § 201.02 (3rd ed. 1977).
When the appellant made the inculpatory statement, Gaut immediately stopped the conversation and advised her of her constitutional rights.
Under the facts in this case, the trial court correctly examined the totality of the circumstances surrounding the giving of this statement and determined that the admission was freely and voluntarily made. Deloach v. State, Ala.Cr.App., 356 So.2d 222; Holmes v. State, Ala.Cr.App., 342 So.2d 28; Fitzhugh v. State, 35 Ala.App. 18, 43 So.2d 831.
Ill
Next the appellant claims the trial court committed reversible error by refusing her written requested jury instructions on second degree manslaughter.
Generally, a defendant is entitled to a charge on the lesser degree of homicide, second degree manslaughter in this case, if there is any reasonable theory from the evidence to support the offense. Chavers v. State, Ala., 361 So.2d 1106. Further, the issue is not what is the court’s view of the evidence, “but simply whether such evidence was presented.” Hunter v. State, 295 Ala. 180, 325 So.2d 921; Giles v. State, Ala.Cr.App., 366 So.2d 351.
In Smith v. State, 56 Ala.App. 609, 324 So.2d 323, second degree manslaughter was defined as:
“ ‘[ T]he unlawful killing of another human being, without malice and without intent to kill or to inflict the injury resulting in death, but accidentally committed by the accused while he was doing an unlawful act amounting to a misdemean- or or accidentally committed by the accused while he was doing a lawful act, *868 but in a grossly negligent or improper manner.’ ”
In the present case, there is no evidence that Windrell Floyd accidentally killed the deceased. The evidence presented showed that Windrell Floyd and the appellant had discussed killing the deceased and had a plan to commit the homicide. In the appellant’s statement to the police, she said that Windrell Floyd had to shoot the deceased because the deceased had “jumped” him. The evidence does not indicate an unintentional or an accidental killing. The evidence showed that Floyd was waiting in the deceased’s home with a loaded gun in order to “talk” with him. Floyd was in the deceased’s home without the deceased’s knowledge, but with the knowledge and consent of the appellant. There is no dispute that Floyd shot the deceased four times in the head and one time in the chest.
The Supreme Court of Alabama in Williams v. State, 251 Ala. 397, 39 So.2d 37, stated:
“ ‘It has long been the settled law of the state that where the evidence shows that the blow which produced death was with a deadly weapon intentionally aimed at the person slain, the homicide, if not excusable on the ground of self-defense, is either murder or manslaughter in the first degree. The law in respect to manslaughter in the second degree is not applicable in such case.’ ”
In the case at bar, no evidence was presented to support an instruction to the jury on the offense of second degree manslaughter.
IV
The appellant asserts that the trial court erred by refusing to submit to the jury her written requested instructions on self-defense. According to the appellant, the evidence showing that Windrell Floyd had to kill the deceased after being “jumped” by him was evidence of self-defense as well as evidence of second degree manslaughter. The determination of this question, as we have stated before, is “simply whether such evidence was presented.” Hunter v. State, supra; Giles v. State, supra.
In Naugher v. State, 105 Ala. 26, 17 So. 24, the three elements of self-defense were noted by the Supreme Court. The defendant must show: “First, that at the time there was a necessity to take life, or that the circumstances were such as to create in the mind of the defendant a reasonable belief that it was necessary in order to save life or to prevent great bodily harm; second, that there was no reasonable mode of retreat or escape; and third, it must not appear that the defendant provoked or was at fault in bringing on the difficulty.”
In the present case, the fact that the deceased owned a .25 caliber automatic pistol did not give support to the appellant’s plea of self-defense. No evidence was shown that the pistol had been fired. There was no evidence that deceased had possession of the weapon at the time he was shot or that he had attempted to use it to shoot Floyd. We can reasonably conclude that, based on the evidence presented, Windrell Floyd provoked this incident. Under this fact alone, the claim of self-defense would have been properly denied by the court. See C. Gamble, McElroy’s Alabama Evidence, § 457.02(5)(a), (3rd ed. 1977).
V
The evidence presented in the case at bar raised questions of fact for the jury. This evidence, if believed by the jury, was sufficient to sustain the appellant’s conviction. Therefore, the denial of the motion to exclude the State’s evidence was not error. Young v. State, 283 Ala. 676, 220 So.2d 843.
We have examined the record and have found no error prejudicial to the appellant; therefore, it is our opinion that the judgment of conviction by the Jefferson Circuit Court should be affirmed.
AFFIRMED.
All the Judges concur.