472 So.2d 1092 (1984)
Victor KENNEDY
v.
STATE.
7 Div. 966.
Court of Criminal Appeals of Alabama.
January 31, 1984.
Rehearing Denied March 20, 1984.
*1095 Gould H.K. Blair, Homewood, and William T. Denson, Goodwater, for appellant.
Charles A. Graddick, Atty. Gen. and Edward Carnes and Billington M. Garrett, Asst. Attys. Gen., for appellee.
BOWEN, Presiding Judge.
During the predawn hours of December 24, 1980, Victor Kennedy, the appellant, and co-defendant Darrell Grayson broke into the home of Mrs. Annie Laura Orr. After subduing the eighty-six-year-old woman, they tightly wrapped her head with a pillowcase and tape. Then the two men repeatedly terrorized, assaulted and raped their helpless victim who died from suffocation.
Kennedy was indicted for the capital offense defined in Alabama Code Section 13A-5-31(a)(4) (1975): "Nighttime burglary of an occupied dwelling when any of the occupants is intentionally killed by the defendant." A jury found him "guilty of the capital offense as charged in Count One and Count Two of the indictment." The two counts were identical except that Count I charged breaking and entering with the intent to commit "robbery", while Count II charged "robbery in the first degree."
A sentencing hearing was held and the jury recommended the death penalty. The trial judge ordered a presentence investigation and held the mandatory second sentencing hearing. After this hearing, the judge accepted the jury's recommendation and sentenced Kennedy to death by electrocution. Eight issues are argued on appeal.

I
Kennedy's motion for a change of venue was properly denied because he failed to show that "the trial setting was inherently prejudicial or that the jury selection process permitted an inference of actual prejudice." Dobbert v. Florida, 432 U.S. 282, 302, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977); Ex parte Magwood, 426 So.2d 929 (Ala.), cert. denied, Magwood v. Alabama, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983); Franklin v. State, 424 So.2d 1353 (Ala.Cr.App.1982).
There were no actual newspaper articles or examples of media coverage introduced into evidence. The telephone survey conducted to support Kennedy's allegation of a prejudiced and biased public opinion was, by the pollster's own admission, not representative of the entire county. The survey omitted a significant area of the county. Although the population of Shelby County was 66,000, only 100 people completed the survey. Fifty nine of those "recalled the incident", and thirty "felt as *1096 though the two men arrested were guilty." In itself, this is insufficient to demonstrate the existence of either actual prejudice or a pervasive hostility within the community. Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).
Appellate counsel speculates that "classical" prejudice is present because Kennedy was "male, black and indigent while the victim was white, female, elderly and of a prominent and well-known local family, the crimes as charged were rape, murder and robbery; and the crimes occurred in a small, peaceful and quiet town located in a generally small, peaceful and quiet county." The record simply does not support this contention. State v. Thompson, 287 N.C. 303, 214 S.E.2d 742, 745 (1975) (prominence of victim); Chenault v. State, 234 Ga. 216, 215 S.E.2d 223, 227-228 (1975) (victim was well-known and highly respected); Smith v. Commonwealth, 219 Va. 455, 248 S.E.2d 135, 140 (1978). Kennedy has failed to show that he could not or did not receive a fair trial in the jurisdiction in which he was convicted.
"To establish the existence of prejudice against a defendant sufficient to justify a change of venue, specific facts and circumstances must be established to indicate it will be practically impossible to obtain an impartial jury to try the case. Such a showing may not be based on speculation." State v. Salem, 230 Kan. 341, 634 P.2d 1109, 1112 (1981).

II
Kennedy argues that, under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), he was denied due process when the trial judge refused to order the State to produce for his inspection codefendant Grayson's confession. Although Grayson never testified at trial, the trial judge reviewed in camera his two written confessions and found that "none of the testimony contained therein would be of benefit to defendant." Our review confirms that finding.
Brady held that a prosecutor's failure to disclose evidence favorable to an accused, who specifically requests it, violates the defendant's right to due process when the evidence is material to guilt or punishment. The accused is ordinarily not entitled to pretrial inspection of statements of prosecution witnesses. Smith v. State, 282 Ala. 268, 276, 210 So.2d 826 (1968). This rule applies to statements of accomplices and co-defendants. Head v. State, 392 So.2d 860, 863 (Ala.Cr.App.1980), cert. denied, 392 So.2d 869 (Ala.1981); McLaren v. State, 353 So.2d 24, 32-3 (Ala.Cr.App.), cert. denied, 353 So.2d 35 (Ala.1977); Beard v. State, 337 So.2d 1372, 1377 (Ala. Cr.App.1976); Annot. 7 A.L.R.3d 8, Sections 16(b) and (d) (1966).
Here, there was no suppression of exculpatory evidence like that condemned in Brady. Defense counsel admitted that he had seen the statement: "I had it in my hand and glanced at it briefly." Although the State made no reference to Grayson's statements, defense counsel, on cross examination of Sheriff's Investigator Reed Smith, attempted to elicit patently inadmissible hearsay information about what Grayson had told Reed. When counsel continued this line of inquiry after the court had sustained the State's objection, the prosecutor offered "to stipulate Mr. Grayson's statements in evidence if Mr. Denson (defense counsel) would like to have them." At that point, the judge remarked that nothing contained in the statements would benefit the defendant.
In the jury's absence, the trial judge inquired into defense counsel's reaction to the State's offer to stipulate to Grayson's statements. The trial judge offered defense counsel the opportunity to see the statements before ruling on the State's motion. Counsel declined both the State's offer to stipulate and the judge's offer to inspect. Error cannot be predicated on the nondisclosure of statements where defense counsel declined the opportunity to review the information.
It is also argued that the State failed to produce the first statement Kennedy gave the police after his arrest. At trial, defense *1097 counsel argued that he had no prior knowledge of this statement. His allegations were contradicted by the prosecutor, who took the witness stand and was cross examined by defense counsel. The District Attorney testified that he had given defense counsel a copy of the particular statement and that counsel had referred to it in a previous trial. An assistant district attorney, in denying the alleged failure to produce, stated that "we specifically gave the defense counsel all copies of any statements made by the Defendant" and that "less than thirty days ago when a trial involving the same defendant and the same attorney and the same witness, Mr. Reed Smith was under oath and in response to questions by defense counsel, Mr. Bill Denson, he was advised that he took a statement on the 24th day of December from Victor E. Kennedy concerning this case."
After hearing arguments, testimony, and having an off-the-record discussion with counsel, the trial judge specifically found that "the district attorney ... or a member of his office had substantially complied with the Court's previous order" granting discovery. There is nothing in the record to dispute this factual determination.
We have reviewed both statements Grayson gave the police. Although Grayson does admit that he was the one who actually taped the pillowcase over Mrs. Orr's head and that he was the last one in the room with her, his statements implicate Kennedy as an active participant in the offense and incriminate him the way no other evidence could. Our review confirms the trial judge's finding that nothing in Grayson's statements would benefit Kennedy and explains why defense counsel refused the State's offer to place them in evidence and even the opportunity to review them at trial.
Finally, we note that the use of Grayson's statements at trial would not have changed the result by creating a reasonable doubt where one did not otherwise exist. "Even where there is total nondisclosure of information the test is whether the use of the information at trial would have changed the result by creating a reasonable doubt where one did not otherwise exist." Raines v. State, 429 So.2d 1104, 1108 (Ala.Cr.App.1982).

III
Kennedy argues that the admission into evidence of a transcript of his tape-recorded statement without the production of the actual tape recording constituted error in violation of the best evidence rule. We disagree.
Mrs. Orr's body was discovered at approximately 9:00 A.M., December 24, 1980. After his arrest, Kennedy gave three statements to Sheriff's Investigator Reed Smith. The first was given at 4:50 P.M. on the afternoon of December 24th. In that statement, which was very short and general, Kennedy stated that he went to Mrs. Orr's home with Grayson and "stood at the corner stooping down watching while he (Grayson) went inside." Kennedy signed this written statement.
His second statement was given at 9:50 on the morning of December 26th. This was also a written statement which Kennedy signed. In this statement, Kennedy admits going into Mrs. Orr's home with Grayson but states that it was Grayson who committed the rape. The substance of this confession is that Grayson was responsible for everything that happened to Mrs. Orr because Kennedy was searching the rest of the house while Grayson was in the bedroom with Mrs. Orr.
The third statement was given at 9:35 on the morning of December 29th. This statement was tape-recorded. This third statement was more detailed than the two previous statements and corroborated the second confession. An unsigned typewritten transcript of this third statement was introduced into evidence at trial over defense counsel's objection that "the recording itself would be the highest and the best evidence." The record only shows that the transcript was not signed, not that Kennedy refused to sign. "(A) written confession *1098 requires no signature by the defendant." Gordon v. State, 252 Ala. 492, 493, 41 So.2d 610 (1949). Even "(a) written confession, which the accused has acknowledged orally to be correct, is not rendered inadmissible because of his refusal to sign it." C. Gamble, McElroy's Alabama Evidence, Section 200.19 (3rd ed. 1977).
In establishing the predicate for the admission of this transcript of the third statement, Investigator Smith testified that he tape-recorded the entire conversation, that he used a reliable and accurate tape recorder, that the tape recording was a "true, accurate, authentic, correct and complete recording of the conversation", and that there were "no changes, additions, alterations, or deletions" made to the recording. He further testified that Mrs. Drake of the Sheriff's Office made a typewritten transcript of the tape recording, that he read the transcript and compared it to the recording for accuracy, and that the transcription "truly, accurately, authentically, correctly, and completely transcribes" the recording. Smith also testified that "this transcription is in fact true, accurate, complete, correct and completely transcribes that conversation."
Defense counsel's objection that the transcript was not "the highest or best evidence" was made before the juryno such objection being made during the suppression hearing. Kennedy did not testify at that hearing and there is absolutely no evidence to contradict the voluntariness of all three statements. Although defense counsel had received a copy of the transcript six to eight weeks before trial, pursuant to a pretrial motion to produce, the accuracy and authenticity of the transcript was never disputed.
We addressed this very issue in Hawkins v. State, 443 So.2d 1312 (Ala.Cr.App.1983).
"Hawkins' (the appellant) argument that the tape recording was the best evidence of his statement is without merit. The best evidence rule is applicable only to writings and does not apply to tape recordings. United States v. Conway, 507 F.2d 1047 (5th Cir.1975); United States v. Duffy, 454 F.2d 809 (5th Cir.1972); Annot. 58 A.L.R.3d 598, Section 7 (1974). `Although it is sometimes said loosely that a party must produce the best evidence which the nature of the question admits, there is no rule of law that is so all-encompassing.' C. Gamble, McElroy's Alabama Evidence, Section 212.01 (3rd ed. 1977). `Where a tape recording of accused's confession has been made, the best evidence does not require that the recording be produced in court.' 23 C.J.S. Criminal Law, § 833e (1961).
"However, once the State attempted to show that the confession was in writing, `then the best evidence rule governed the question of identifying the writing setting forth the confession.' Bennefield v. State, 281 Ala. 283, 285, 202 So.2d 55 (1967); Gordon v. State, 252 Ala. 492, 493, 41 So.2d 610 (1949); Elkins v. State, 250 Ala. 672, 674, 35 So.2d 693 (1948). Once the State attempted to prove the contents of the confession by the use of the typewritten transcript of the lost tape recording, the best evidence rule became applicable and the authenticity of the transcript became the pivotal question.
"Here, defense counsel objected to the admission of the typewritten transcript on the ground that `there's been no testimony by the person that typed this that this is a true and accurate copy.' In Bennefield, `the stenographer who took down the questions and answers in shorthand and later prepared the transcription did not testify. She was the only one who could testify to the authenticity of the transcription made from her shorthand notes.' Bennefield, 281 Ala. at 285 [202 So.2d 55] (emphasis added). Here, Detective Pickett could and did authenticate the typewritten transcript.
"`Although the defendant maintains that the stenographer who transcribed the tape recording is the only person who could authenticate the transcript, the stenographer could only testify that the transcript accurately reflected what was on the tape recording.

*1099 Smith, who was present during the interrogation, who listened to the tape recording, and who read the written transcription, could properly testify that the transcript accurately reflected what was contained on the tape and that the tape recording accurately reflected that which was actually said during the interview. Gwin v. State, 425 So.2d 500, 505 (Ala.Cr.App.1982), cert. quashed, Ex parte Gwin, 425 So.2d 510 (Ala.1983).'
"See also Watson v. State, 398 So.2d 320, 326 (Ala.Cr.App.1980), cert. denied, 398 So.2d 332 (Ala.1981).
"We do not think that Bennefield provided the only way in which a transcript of a confession may be authenticated. A typewritten transcript of a recorded conversation is admissible where the officer who listened to the conversation at the time of the recording testifies that the transcript accurately reflected the conversation. People v. Ketchel, 59 Cal.2d 503, 30 Cal.Rptr. 538, 381 P.2d 394, 401 (1963).
"Where the use in evidence of typewritten transcripts of sound recordings has been objected to as in violation of the best evidence rule, the general rule is that the typewritten transcripts have been held admissible in evidence if their accuracy and reliability is clearly established. 29 Am.Jur.2d Evidence, Section 436 (1967); Annot. 58 A.L.R.3d 598 (1974). Since the accuracy and reliability of the transcript was adequately established, we find no error in its admission into evidence."
This same issue was also addressed in Beech v. State, 439 So.2d 1331 (Ala.Cr.App. 1983), a capital case in which the defendant was sentenced to life without parole. In that case the defendant "did not challenge the accuracy of any specific parts of the statement", although he attempted to explain certain discrepancies between his pretrial statement and his previous testimony at trial. There, the defendant did not deny that the statement was voluntary or that it was substantially accurate. In Beech, we held:
"Under these circumstances, especially in light of appellant's own verification of the voluntariness and accuracy of the statement, there is no reason to doubt the authenticity of the transcription, and the trial court will not be held in error for admitting it. Compare, Fleming v. State, 57 Ala.App. 556, 329 So.2d 616 (1976); Beckham v. State, 389 So.2d 573 (Ala.Cr.App.1980); and Swann v. State, 412 So.2d 1253 (Ala.Cr.App.1982) (other properly predicated evidence of an accused's incriminating statements was admissible, even though a tape recording might have been more accurate).
"Moreover, although it possibly created some doubts in the minds of the jury as to the credibility of certain portions of appellant's trial testimony (which was the prosecution's motive for presenting it), appellant's pre-trial statement was exculpatory in nature and consistent with his trial testimony emphatically denying any participation in the murders.
"We are convinced that the jury's verdict would have been the same had the tape recording been admitted into evidence instead of, or in addition to, the written transcription of that recording. See, A.R.A.P. 45."
See also Parker v. State, 337 So.2d 1378 (Ala.Cr.App.1976) (police officer allowed to relate accused's oral confession over argument that best evidence is the written and signed form of the confession).
We find no error in the admission of the transcript of Kennedy's tape-recorded statement. "The best evidence rule has as its basic justification the prevention of fraud.... A second justification for the rule is that oral testimony simply is not as reliable as the written word." C. Gamble, McElroy's Alabama Evidence, Section 212.02 (3rd ed.1977). Neither purpose of the rule was violated here.
Kennedy's third statement was consistent with and corroborated his second statement about which no issue has been raised on appeal. Neither at trial nor on appeal has the accuracy or authenticity of any *1100 statement been attacked. Investigator Smith testified that the transcript accurately reflected the contents of the tape recording and, furthermore, that the transcript was a complete and accurate account of the actual conversation.
Even if the admission of the transcript violated the best evidence rule and constituted error, such error was harmless and did not prejudice Kennedy. Here, as in Beech, we are convinced that the jury's verdicts, both at the guilt and sentencing phases of the trial, "would have been the same had the tape recording been admitted into evidence instead of, or in addition to, the written transcription of that recording."

IV
The trial judge properly refused Kennedy's request for instructions to the jury on the crimes of rape and criminally negligent homicide as lesser included offenses of the charged crime.
In his "order on imposition of death penalty", the trial judge summarized the evidence presented at the guilt determination phase of Kennedy's trial. The judge's order contains general and specific findings of fact which are accurate and supported by the record. His findings of fact are as follows:
"GENERAL FINDING OF FACTS
"The Court makes the following general findings of fact in this case.
"Mrs. Annie Laura Orr was an eighty-six (86) year old widow who lived alone in her house in Montevallo, Alabama. At the time of her death, she stood about five feet, three inches tall, and weighed some one-hundred seventeen pounds. Her granddaughter visited her during the day of December 23rd, 1980, and found her appearing to be in good health, ambulatory, and in possession of her mental faculties. Her personal physician, Dr. Lewis Kirkland, described her as being in good health for a woman of her age. She did, however, have some trouble with physical movement, and had employed a maid to help her bathe and keep her house.
"During the evening hours of December 23rd, 1980, the Defendant Victor Kennedy, Co-Defendant Darrell Grayson, and two other individuals, met at Kennedy's residence, also in Montevallo, and a short distance from that of Mrs. Orr. They drank wine and played cards. Sometime shortly after midnight, and after the other individuals had gone, Kennedy and Grayson left Kennedy's residence on foot, walking in the direction of Mrs. Orr's house. They were armed with a .38 caliber Smith and Wesson pistol, which belonged to Kennedy. They decided to burglarize Mrs. Orr's residence in order to get some money. They had previously discussed such a burglary, that Mrs. Orr was elderly, and where she kept her money.
"They entered the Orr house during the very early morning hours of December 24th, 1980, through a rear basement door. They then proceeded through the dirt basement, up several steps, and into the main living portion of the house near Mrs. Orr's bedroom. Although a light was on in the living room, the Defendants also used a cigarette lighter to illuminate their way.
"Once inside the living portion of the house they entered Mrs. Orr's bedroom where she was apparently sleeping. They subdued and beat her, striking her in the head with the pistol and breaking several of her ribs. They then placed a pillowcase over her head and wrapped two relatively long lengths of masking tape very tightly around her head so that when they were finished her head then appeared to be that of a mummy. They then proceeded to look for money and other valuables.
"When apparently they could not find a significant amount of cash, they began threatening Mrs. Orr by beating her further, threatening to drown her, and firing two shots from Kennedy's pistol, into her bedroom clock and wall. Also during their assault, they raped Mrs. Orr repeatedly. Mrs. Orr lived through the assault of being raped, beaten, and threatened, unable to *1101 see or adequately breathe for at least forty-five (45) minutes. She then died.
"Leaving Mrs. Orr dead on her bed, Kennedy and Grayson exited the Orr house through its front door, taking with them at least two decks of playing cards, a wallet of Mrs. Orr, and a small amount of money.
"The Defendants returned to Kennedy's residence much the same way they had come to Mrs. Orr's house. Along that way, they dropped several of the playing cards and the wallet they had taken. At Kennedy's residence, they drank some more wine and talked about what they were going to do Christmas. Kennedy also threw away the pistol they had used during the burglary. Although an extensive search was conducted, the pistol was never recovered. Kennedy stored the playing cards, taken from the Orr house, in his bedroom. And Grayson, eventually, left the Kennedy residence.
"Later that same morning, December 24th, 1980, Mrs. Orr's son, Dr. Milton Orr, who also lives in Montevallo, arrived, as was his custom, at his mother's house to visit with her before opening his dentist's office. He found his mother as the Defendants had left her. She was lifeless, crumpled on her bed which had been stripped of its linens, in her bedroom which had been ransacked. Her head was wrapped in the taped pillowcase, and her body, dressed in her blood and semen stained nightgown, was covered with dark bruises. Dr. Orr immediately called his mother's physician, Dr. Kirkland, and then the police.
"The scene was secured, processed by evidence technicians, and evidence therefrom was recovered. The wallet was found and identified through pictures of Mrs. Orr's family contained therein. The playing cards that the Defendants had dropped returning to the Kennedy residence were also recovered. Pursuant to oral and written consent, a search was made of the Kennedy residence and the remainder of the playing cards were found.
"Kennedy was arrested and made at least three statements concerning his participation in the alleged offense. Each statement was made after the Defendant was duly informed of, and knowingly and intelligently waived, his pertinent constitutional rights. Each of these statements were contradictory, and each blatantly omitted several crucial and obvious aspects of the Defendant's personal involvement in the crime. In short, the Defendant, in each of these statements, to some degree, either lied, or deliberately misled, in order to minimize and avoid his own culpability. And, such minimization and avoidance was clearly rebutted by the other testimony and evidence presented.
"The physical and scientific evidence presented during the determination of guilt confirmed and proved the following:
1) Mrs. Orr died by being suffocated by the pillowcase taped around her head.
2) She died slowly, being gradually starved of air.
3) Before she died she was severely beaten causing bruises to be all over her body, and several of her ribs to be broken.
4) She was also raped repeatedly and had large bruises on the inside of her thighs where her legs had been forced apart.
5) The wrapping of the pillowcase tightly with tape, the beatings, and the multiple rapes were the work of both the Defendant Victor Kennedy, and the Co-Defendant Darrell Grayson.
6) The wrappings of the tape around the pillowcase was so tight that said case and the tape conformed to the facial characteristics of Mrs. Orr.
7) There were some twenty-three latent prints lifted from the scene with only two or three being `readable'. None of these readable lifts matched either defendant. And the lack of fingerprints made by the defendants at the scene was explained by the fact that both were non-secretors.
8) The amount of semen found at the scene and within the body of Mrs. Orr, the fact that part of such semen, *1102 found on Mrs. Orr's nightgown, was of such quantity that it could be typed as consistent with that of Co-Defendant Darrell Grayson (even though he is a non-secretor), and the fact that the rest of the semen, as well as that of Defendant Victor Kennedy, since he too is a non-secretor, could not be typed, are all consistent with the fact that Victor Kennedy actually raped Mrs. Orr, and was not merely an aider or abettor in said act.
9) The bullets recovered at the scene were .38/.357 in caliber and had been fired from a Smith and Wesson pistol, which would be consistent with that weapon of Victor Kennedy taken to the Orr residence the night of the crime. No comparison to said pistol could be made as Kennedy had thrown the weapon away.
10) The shirt Victor Kennedy was wearing at the time of his arrest had splattered, human blood on it.
11) The playing cards found at the scene and along the path the defendants took returning home after the crime, matched those found in the Kennedy residence as being part of the same two decks of playing cards.
"SPECIFIC FINDINGS OF FACTS
"In addition to the General Findings of Fact presented in the foregoing, the Court makes the following specific findings of facts in this case.
"The Defendant Victor Kennedy, did, in the nighttime, with the intent to commit robbery and robbery in the first degree, knowingly and unlawfully, break into and enter the inhabited dwelling of Annie Laura Orr, in Montevallo, Alabama, which was then occupied by the said Mrs. Orr, who was a person lodged therein, and while effecting entry and while in said dwelling, and in the immediate flight therefrom, either Victor Kennedy, or Co-Defendant Darrell Grayson, were armed with a pistol which was a deadly weapon.
"The Defendant Victor Kennedy did intentionally cause the death of Annie Laura Orr, by suffocating her with a pillowcase, during the course of the nighttime burglary described in the foregoing.
"The Defendant Victor Kennedy participated in, and actually committed, the rapes of Mrs. Orr.
"The Defendant either actually, or as an aider and abettor, beat Mrs. Orr."
Kennedy presented no defense at trial.
The trial judge instructed the jury on the lesser included non-capital offenses of murder, felony murder, manslaughter, and burglary in the first degree.
"(D)ue process requires that a lesser included offense instruction be given only when the evidence warrants such an instruction." Hopper v. Evans, 456 U.S. 605, 611, 102 S.Ct. 2049, 2053, 72 L.Ed.2d 367 (1982); Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). The Alabama rule "clearly does not offend federal constitutional standards", Evans, 456 U.S. at 612, 102 S.Ct. at 2053, and requires that a lesser included offense instruction be given if "there is any reasonable theory from the evidence which would support the position." Fulghum v. State, 291 Ala. 71, 75, 277 So.2d 886 (1973). See also Chavers v. State, 361 So.2d 1106 (Ala.1978).
Here, the requested instruction on rape was properly refused because rape is not a lesser included offense, as that term is defined by Alabama Code Section 13A-1-9(a) (1975), of any offense charged in the indictment. Rape is not a lesser included offense of either an intentional killing or burglary when defined in the indictment as breaking and entering with the intent to commit robbery. Olkewicz v. State, 385 So.2d 67 (Ala.Cr.App.), cert. denied, 385 So.2d 69 (Ala.1980) (assault with intent to murder is not a lesser included offense of rape); Aiola v. State, 39 Ala.App. 215, 96 So.2d 816 (1957) (assault with intent to rape is not a lesser included offense of burglary).
*1103 An instruction on criminally negligent homicide was properly refused because there was no rational basis for such a verdict. Phelps v. State, 435 So.2d 158, 165 (Ala.Cr.App.1983). Kennedy was not guilty of criminal negligence. There is no evidence to support any finding that he failed to perceive a substantial and unjustifiable risk that his actions would cause and result in Mrs. Orr's death. Here, the risk of death was not inadvertently created. "A killing is not accidental when the act causing death is done intentionally." Phelps, 435 So.2d at 165.

V
Contrary to Kennedy's argument, the trial judge did not instruct the jury that a conviction for the burglary-intentional killing offense charged in the indictment could be based upon a finding of criminally negligent homicide or that a conviction for this capital offense could be returned in the absence of proof of an actual intent to kill.
In defining the meaning of a culpable mental state, the trial judge defined the terms intentionally, knowingly, recklessly, and criminal negligence as provided in Alabama Code Section 13A-2-2 (1975). The jury was not charged on criminally negligent homicide. The trial judge repeatedly defined the meaning of intentional and instructed the jury that the killing must be intentional to authorize a conviction of the capital offense charged. The judge properly and carefully charged that an intentional killing is a necessary element of the capital offense. Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); Beck v. State, 396 So.2d 645, 662 (Ala. 1980).
No reasonable construction of the trial judge's oral charge permits the interpretation advanced on appeal. The entire charge must be construed as a whole. Harris v. State, 412 So.2d 1278, 1281 (Ala. Cr.App.1982). When reviewing a judge's oral charge, "each statement made by a judge to the jury should be examined in light of the entire charge and ... isolated statements which appear prejudicial when taken out of context may be innocuous when viewed in light of the entire trial." United States v. McCoy, 539 F.2d 1050, 1063 (5th Cir.1976), cert. denied, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977). "`The language of a charge must be given a reasonable construction, and not a strained and unreasonable one.'" Harris v. State, 394 So.2d 96, 100 (Ala.Cr.App. 1981). "(F)anciful theories based on vagaries of the imagination" should not be indulged in construing the court's charge. Addington v. State, 16 Ala.App. 10, 19, 74 So. 846 (1916).

VI
We do not find that the trial judge's instructions at the sentencing phase of the trial were calculated to mislead or had the effect of misleading the jury into the belief that voluntary intoxication was immaterial to the determination of Kennedy's sentence.
In the guilt phase of the trial, the judge charged the jury that voluntary intoxication is "immaterial in a consideration of whether the defendant acted recklessly where recklessness is an element of the offense charged." He further charged that "intoxication, ... is not a defense to a criminal charge but may be considered by the jury, if relevant, on the question of whether the fact of intoxication negates an element of the offense charged, such as intent, but not the element of recklessness."
At the sentence hearing, the judge did not give any instructions on intoxication but did charge that as a mitigating circumstance the jury might consider a "substantially lessened or substantially diminished capacity." Kennedy's argument centers around the judge's instruction that "(i)n evaluating the testimony presented at this sentence hearing, you are to abide by the same rules of law which I have given you concerning the evaluation of testimony presented during the guilt phase of the trial." Kennedy contends that this charge had the effect of instructing the jury that voluntary intoxication is immaterial to the *1104 sentence issue because of the instructions in the guilt phase that voluntary intoxication was "immaterial" in determining recklessness and did not constitute a defense.
Kennedy's evaluation of the effect of the judge's charge at the sentencing phase is possible only because the particular remark of the judge is taken out of context and isolated from the remainder of his charge. The jury heard additional testimony at the sentence hearing and the judge was simply instructing them to apply the same rules and guidelines in ascertaining the factual truth from the evidence presented as they did at the guilt phase. His charge clearly refers to the rules applicable to "the evaluation of testimony" and does not mention substantive rules of law. Even a literal interpretation of the particular words Kennedy finds objectionable does not support his argument.
The context in which the instruction was given supports this literal interpretation and removes any doubt as to the intended and clear meaning of the judge's charge. Those instructions following the complained-of charge clearly reveal that the meaning intended and expressed was that the rules for evaluating testimonial evidence to ascertain facts were the same for both the guilt and sentence stages of the trialnot that the rules of substantive law governing the legal significance of facts once ascertained were the same.
A cardinal principal of appellate review of jury instructions is that "a single instruction to a jury may not be judged in artifical isolation, but must be viewed in the context of the overall charge." Cupp v. Naughten, 414 U.S. 141, 146-47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). "(T)he fact that isolated instructions are erroneous or misleading is no ground for reversal where the instructions as a whole present the case properly." Harris v. State, 412 So.2d 1278, 1281 (Ala.Cr.App.1982).
When these instructions were given, no objection was made. Although this failure does not preclude review in a capital case, it does weigh against any claim of prejudice. Bush v. State, 431 So.2d 563, 565 (Ala.1983).
At the sentencing stage, the trial judge charged the jury on the statutory mitigating circumstances, including the absence of substantial capacity. Section 13A-5-36. He also instructed the jury that they could also consider "as a mitigating circumstance any aspect of the defendant's character and life and any of the circumstances of the capital offense which tend to indicate that the defendant should not be sentenced to death."
We find no conflict in the judge's instructions in the sentencing phase of the trial. We further find that the requirement of the Eighth and Fourteenth Amendments was satisfied and the jury was not precluded "from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-2965, 57 L.Ed.2d 973 (1978).

VII
We recognize that Bufford v. State, 382 So.2d 1162, 1173-74 (Ala.Cr. App.), cert. denied, 382 So.2d 1175 (Ala. 1980), and Keller v. State, 380 So.2d 926, 937 (Ala.1980), cert. denied, 380 So.2d 938 (Ala.Cr.App.1980), support Kennedy's argument that the trial judge must find the existence of an aggravating circumstance in addition to the particular aggravating circumstance found in the indictment before the death penalty may be imposed. This misinterpretation was corrected in Kyzer v. State, 399 So.2d 330, 334-39 (Ala. 1981), which effectively overruled Bufford and Keller. Dobard v. State, 435 So.2d 1338 (Ala.Cr.App.1982), affirmed, 435 So.2d 1351 (Ala.1983). The correct rule is that the aggravating circumstance charged in the indictment may be used as the circumstance aggravating that charge. Julius v. State 455 So.2d 975 (Ala.Cr.App.1983).

*1105 VIII
Kennedy's sentence of death does not violate Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), holding that the Eighth Amendment prohibits the imposition of the death penalty on one who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.
In imposing the death penalty, the trial judge made specific factual findings that Kennedy "participated in every aspect of the capital offense", and that he "beat, raped, and intentionally killed" Mrs. Orr. The evidence shows that before entering the house Kennedy had given his pistol to Grayson. The trial judge repeatedly instructed the jury that an intent to kill was an essential element of the capital offense.
In reviewing a capital conviction in which the accused concedes at trial that he participated in the underlying felony but denies that he committed or aided and abetted the intentional killing, this Court must apply a two-part test. "To affirm a finding of a `particularized intent to kill', the jury must be properly charged on the intent to kill issue, and there must be sufficient evidence from which a rational jury could conclude that the defendant possessed the intent to kill." Ex parte Raines, 429 So.2d 1111, 1113 (Ala.1982). Both prongs of this test are satisfied in this case.
Kennedy's speculation that the jury found him guilty even though they did not believe he committed or participated in the killing is totally unacceptable. The jury was properly instructed on the relevant law, and it must be presumed that they followed the judge's instructions. Marshall v. Lonberger, 459 U.S. 422, 103 S.Ct. 843, 853-54, n. 6, 74 L.Ed.2d 646 (1983).
"A crucial assumption underlying that system (of trial by jury) is that juries will follow the instructions given them by the trial judge. Were this not so, it would be pointless for a trial court to instruct a jury, and even more pointless for an appellate court to reverse a criminal conviction because the jury was improperly instructed." Parker v. Randolph, 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979) (White, J., dissenting).

IX
In accordance with Beck v. State, 396 So.2d 645 (Ala.1980), and Alabama Code Section 13A-5-53 (1975), we make the following determinations in affirming the imposition of the death penalty in this particular case.
As required by Beck, we find:
(1) The crime was in fact one punishable by death. Kennedy was indicted and convicted for violating Alabama Code Section 13A-5-31(a)(4), which is by statutory definition and designation a capital offense.
(2) Similar crimes are being punished capitally throughout the state. Lindsey v. State, 456 So.2d 383 (Ala.Cr.App.1983), appeal pending; Clisby v. State, 456 So.2d 86 (Ala.Cr.App.1982), affirmed in part, and remanded in part 456 So.2d 95 (Ala.1983).
(3) We also find that the sentence of death is appropriate in relation to Victor Kennedy. Death is unquestionably appropriate for this criminal who burglarized, beat, terrorized, raped and suffocated to death a helpless and defenseless eighty-six-year-old woman.
We also apply Alabama Code Section 13A-5-53 in reviewing Kennedy's conviction and sentence and make the following findings: (1) There is no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. (2) Our independent weighing of the aggravating and mitigating circumstances supports the findings of the trial judge and indicates that death is the proper sentence. In his written order on imposition of the death penalty, the trial judge stated: "The Court finds that the actions of the Defendant were completely barbaric, showing a complete and utter disregard for not only human life but human dignity. The Court cannot think of a case *1106 it has seen, heard, or even read, that would equal the cruelty shown in this case by the Defendant to Mrs. Orr." (3) Finally, considering both the crime and this defendant, we determine that death is neither excessive nor disproportionate to the penalty imposed in similar cases.
In our search of the record in both the guilt and sentence phases of Kennedy's trial, we have found no error. That search convinces us that the judgment of the circuit court is due to be affirmed.
AFFIRMED.
All Judges concur.